1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TATIANA WESTBROOK, an individual;
JAMES WESTBROOK, an individual;
HALO BEAUTY PARTNERS, LLC, a
Nevada Limited Liability Company,

              Plaintiffs,

     v.

KATIE JOY PAULSON, an individual;
WITHOUT A CRYSTAL BALL, LLC, a
Minnesota Limited Liability Company; and
DOES 1 through 100, inclusive,

              Defendants.

NO.  2:20-cv-01606 BJR

**DEFENDANTS' MOTION TO
DISMISS**

NOTED FOR CONSIDERATION:

December 28, 2020

DEFENDANTS' MOTION TO DISMISS

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

## I.  INTRODUCTION

Plaintiffs Tatiana and James Westbrook are prominent and notorious social media personalities in what is referred to as the "beauty" or "beauty drama" scene on YouTube. They are also members in Plaintiff Halo Beauty Partners LLC ("Halo"), which sells certain of their products. The Westbrooks have made large amounts of money by attracting attention from the media and the public. Since the spring of 2019 much—perhaps most—of that attention has been negative. Just a few minutes of searching on the internet yields numerous stories about the Westbrooks' recent, very public, self-made scandals and self-inflicted wounds. These include the scathing blowback they suffered when, in May of 2019, Ms. Westbrook used her massive platform on YouTube to falsely accuse her most prominent business rival, the 19-year-old James Charles, of sexual misconduct. Ms. Westbrook deliberately re-ignited that controversy when she returned to YouTube in June of 2020 to falsely blame two of her *other* rivals—the prominent social media personalities Jeffree Starr and Shane Dawson—for "coercing" her into making the earlier defamatory accusations against Charles. She alleged that Starr and Dawson engaged in this coercion as part of their far-flung and murderous conspiracy to clear the way for them to promote beauty and health supplements that would compete with Ms. Westbrook's. In the second video, which Ms. Westbrook states was "approved" by her "legal team," she alleges that Starr and Dawson are responsible for inflicting the severe personal and business injuries she suffered since May of 2019, and warns of coming litigation against them.

Not surprisingly, Ms. Westbrook faced massive criticism for these outrageous allegations, and for her use of an anti-gay stereotype to harm a young competitor and boost her own sales. This criticism was rampant on social media, including from the most famous and widely-subscribed YouTube personality in the world (with 100 million subscribers), who goes by the name "PewDiePie." The scandals that followed the two videos are referred to in the media, respectively, as *Dramageddon 2.0* (*Dramageddon 1.0* was an earlier scandal involving other YouTube celebrities) and *Karmageddon*.

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

The Westbrooks' troubles multiplied in October of this year, when their business partner in Halo, Clark Swanson, sued them for $5 million in Los Angeles County Superior Court for fraud, improper diversion of corporate assets, and breach of fiduciary duty. Perhaps most injurious to Plaintiffs' reputation was Swanson's **sworn** accusation that Ms. Westbrook boasted of her ability to use her celebrity to sell a "shit product" to her fans. That lawsuit—the filing of which was first reported by Defendants Katherine Paulson and her corporation Without a Crystal Ball LLC—also received very wide coverage in both social and mainstream media.

Just days after Defendants broke the story of the Swanson lawsuit, Plaintiffs filed this lawsuit against them in Seattle. Presumably not by mere coincidence, they sued Defendants for exactly the same amount as Mr. Swanson sued them—$5 million. They allege that Defendants are responsible for the severe personal and business injuries they have suffered during the period of *Dramageddon 2.0* and *Karmageddon*, simply by virtue of their reporting related to these events. This suit is part-public relations stunt and part-intimidation, designed to divert attention from the real sources of Plaintiffs' troubles and to chill further negative reporting on them. The most obvious indication of that intent is the Westbrooks' decision to sue only Defendants, with their relatively modest audience, and not the very prominent, wealthy, and influential persons whom she—with her attorneys' approval—publicly blamed for *the very same injuries*. Remarkably, Plaintiffs name 100 "DOE" defendants, alleging they are unaware of their identity despite the fact that they (with their attorneys' "approval") publicly named Starr and Dawson as the cause of those injuries.

Putting aside the patent silliness of Plaintiffs' attempt to blame a small YouTube channel located in Hanover, Minnesota for their injuries, the Complaint should be dismissed now for several reasons. First and most importantly, Plaintiffs have come nowhere close to establishing that this Court may exercise personal jurisdiction over two Minnesota Defendants who have **zero** relevant contacts with Washington State. Especially troubling is the Westbrooks' attempt to support their assertion of personal jurisdiction by resort to what appear to be demonstrably false

---

DEFENDANTS' MOTION TO DISMISS - 2

**GORDON
TILDEN
THOMAS
CORDELL**

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

representations as to their state of residence. Second, Plaintiffs' decision to name 100 "DOE" defendants precludes this Court's exercise of diversity jurisdiction. Third, Plaintiffs have failed to include necessary and indispensable defendants, including Starr and Dawson. Fourth, Plaintiffs' claims for Consumer Protection Act violations and intentional and negligent infliction of emotional distress are not supported by factual allegations sufficient to raise a plausible inference of Defendants' liability under those theories. Finally, Plaintiffs' claim for "Civil Harassment" fails because: (1) there is no federal subject matter jurisdiction with respect to this state-law criminal procedure statute; (2) Plaintiffs failed to submit the required sworn affidavit in support of that "claim"; and (3) that statute does not turn Defendants' conduct—the use of public sources to report *about* a celebrity for the purpose of reaching a general internet audience—into a claim for harassment targeted *at* the celebrity at the center of those events.

## II.  STATEMENT OF FACTS[1]

**A.    Background events leading to Plaintiffs' filing of this lawsuit**

**1.    Ms. Westbrook falsely accuses a young rival of sexual misconduct to an audience of more than 47 million.**

In the spring of 2019, Tatiana Westbrook publicly revealed that she was angry at her rival, the then-19-year-old prominent social media personality James Charles, when she learned that Charles was promoting a product that competed with Ms. Westbrook's own products. Def's Request for Judicial Notice, Appx. B-1. Ms. Westbrook, 37 years-old at the time, publicly described her relationship with Charles as one of mentorship and even akin to mother-son. *Id.* Nevertheless, after "thinking things through" carefully, she decided that, instead of speaking with Charles directly, the best way to deal with the perceived threat to her fame and her brand was to post a video on her YouTube channel, with more than 9 million subscribers. *Id.* In that video, she falsely accused Charles—an openly gay man—of coercing young "straight men" into

---

[1] Undersigned counsel is aware the cited evidence includes profanity that would normally be inappropriate for judicial proceedings. However, the believes the evidence is important to convey the nature of the scandals that form the basis of this suit.

DEFENDANTS' MOTION TO DISMISS - 3

GORDON TILDEN THOMAS CORDELL    600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

"behaving sexually in [his] favor" by "threatening to ruin them," and by use of "tricks" and other "manipulation." *Id.* (at 24:00 - 27:00). She made these public accusations despite her stated belief that Charles was so troubled that he might react by committing suicide, by jumping off the 50th story of the hotel he was then staying at overseas. *Id.*, Appx. B-8 (at 26:00 – 26:20).

NBC news reported that *Bye Sister* was viewed **35 million times** in just the first few days after it was posted. *Id.*, Appx. B-2. Mr. Charles soon posted a video refuting Ms. Westbrook's accusations. *Id.*, Appx. B-3. The scandal then drew the attention of mainstream outlets such as CNN.com and Newsweek.com. *Id.*, Appx. B-4. What followed was a torrent of scathing criticism of Ms. Westbrook. She was called out by other prominent YouTube personalities with massive viewership, for falsely accusing Charles of sexual misconduct for the purpose of attracting attention to her video and her brand, and to harm a competitor. *Id.*, Appx. B-5. She was also criticized by mainstream outlets such as BuzzFeed News and San Francisco NPR and PBS outlet KQED, who took her to task for deploying an anti-gay stereotype—the predatory gay man who "turns" young straight men—to publicly attack a prominent and successful gay male celebrity. *Id.*, Appx. B-6. The maelstrom caused by *Bye Sister* came to be known in the YouTube world and beyond as *Dramageddon 2.0. Id.*, Appx. B-7.

> 2.    **Ms. Westbrook tearfully blames two other rivals for *her* false accusations against Charles, to an audience of more than 12.5 million.**

One year later, when the scandal had simmered down, Ms. Westbrook once again took to YouTube to post a follow-up video, this time making salacious accusations about two other prominent social media personalities—Dawson and Starr. *Id.*, Appx. B-8. That 40-minute video, called *Breaking My Silence*, has so far garnered at least 12.5 million views on Ms. Westbrook's channel, and countless more from the media coverage and re-playing of *Breaking My Silence* on other popular YouTube channels. *Id. Breaking My Silence* had its predictable—and presumably intended—effect; it reignited the controversy and drew massive public attention once again to

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

Ms. Westbrook. This came to be known as *Karmageddon*, presumably because the players were reaping what they had sown in terms of bad publicity and reputational damage. *Id*, Appx. B-9.

In *Breaking My Silence*, Ms. Westbrook purported to apologize for her unfounded defamatory accusations against Mr. Charles and to c all for "kindness," "foregiveness" and "prayer." *Id.*, Appx. B-8. But she then went on to spend most of the 40 minutes blaming Starr and Dawson for the *Bye Sister* debacle and for *Dramageddon 2.0.* She explained that during the months since *Bye Sister*, she had "put the pieces together" and now "realized" that Starr and Dawson had "used, manipulated, and coerced" her into making and posting *Bye Sister*. *Id.* She went on to state that this coercion was part of a wide-ranging conspiracy to "keep her quiet and push her out of the way" for "business reasons," as well as to hurt Charles. *Id.* The ultimate purpose of this shadowy conspiracy, she alleged, was to pave the way for Starr and Dawson (and "many" unnamed others) to launch their own products that would compete with Ms. Westbrook's. *Id.* Ms. Westbrook said she "feared for her life" because she and her attorneys were in the process of exposing this conspiracy, and she already "knew too much." *Id.*   She opined that there were additional players in this conspiracy besides Starr and Dawson, because "this is just too big, I think there were many players." *Id.* Ms. Westbrook explained that she and her legal team had "accumulated evidence" to support these wild accusations, but on the "advice of my attorneys," she could not reveal that evidence yet. *Id.*

Ms. Westbrook also explained that *Bye Sister* and the blowback from it had "poisoned" her reputation, had caused her to become the target of "relentless hate" in the mainstream media and social media platforms, and had caused "enormous" damage to her business and personal health. She explained: "I couldn't sleep. Slowly I became a shell of my former self . . . I've been terrified for a very long time." *Id.* She was so frightened by the alleged conspiracy, she explained, that she had to leave her "L.A. home," and later "had to relocate again . . . and I have taken serious security precautions to protect my safety." *Id.* Near the end of the video, she

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

warned Starr and Dawson that the statute of limitations on defamation and other civil claims against them had not yet run, and suggested litigation against them would soon be coming. *Id.*

Not surprisingly, *Breaking My Silence* reignited the scandal, with Mr. Dawson and his supporters publicly accusing Ms. Westbrook of "fake crying" during the video and being "manipulative." *Id.*, Appx. B-10. The backlash soon went global. PewDiePie posted a heated commentary on *Breaking My Silence*, criticizing Ms. Westbrook for her "unbelievable" manipulation, refusal to take responsibility, and blame-shifting with respect to *Bye Sister*, and saying Ms. Westbrook "has to quit YouTube" because "this is so embarrassing." *Id.*, Appx. B-11. Another popular YouTube commentator named Trisha Paytas posted a video entitled *Tati Is Dumb as Hell*, which drew 2.5 million direct views (and an unknown amount of re-plays on other channels), in which she lambasted Ms. Westbrook for falsely accusing Mr. Charles of "sexual crimes," and then trying to dodge responsibility by saying others made her do it. *Id.*, Appx. B-12.

### 3. The Westbrooks' business partner sues them for fraud and malicious misconduct.

On October 20, 2020, in the midst of the fallout from *Dramageddon 2.0* and *Karmageddon*, the Westbrooks were sued in Los Angeles County Superior Court by Clark Swanson, the 33% minority member in Plaintiff Halo Beauty Partners LLC. *See Swanson v. Halo Beauty, Inc.*, 20SMCV01573 (Los Angeles Superior Court, October 20, 2020). *Id.*, Appx. A. In his detailed complaint, Swanson alleges that the "greedy" Westbrooks "robbed" him of the benefits of his ownership interest in Halo Beauty. *Id.* Mr. Swanson alleges that Ms. Westbrook once boasted of her ability to sell a "shit product" to her loyal followers, simply because of her celebrity. He brings claims of fraud, breach of fiduciary duty, and conversion, among others. *Id.*

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

**B.     The Westbrooks sue Defendants—and no one else—in Seattle, for the harm they previously claimed was caused by Starr, Dawson and their Los Angeles-based conspiracy.**

Defendants were the first to report on the Swanson lawsuit after it was filed. Declaration of Katherine Paulson, ¶ 2. What followed was widespread media coverage of Swanson's claims, in particular the fraud allegations and the evidence of Ms. Westbrook's cynical contempt for her customers and fans. That coverage exploded on social media, but also appeared in mainstream outlets such as Business Insider, MSN.com, Yahoo! News, MTV.com, and Reddit, with headlines such as "Tati Westbrook Sued for Defrauding Millions."

Just days after Defendants broke the story of Swanson's $5 million suit against the Westbrooks, the Westbrooks—seeking to deflect attention from those allegations and that $5 million claim—brought this lawsuit, ostensibly seeking $5 million in damages for injuries they allegedly suffered during *Dramageddon 2.0* and *Karmageddon*. But they did not bring their claims against Starr or Dawson. Instead, they only sued Ms. Paulson and her small solely-owned LLC, both Minnesota residents. *Id.* at ¶¶ 3-4. The Complaint makes no mention of the Westbrooks' very public allegations that the wildly-famous and influential Starr and Dawson— and their Los Angeles-based conspiracy—caused the Westbrooks' Los Angeles-based injuries. Instead, they now allege that Defendants—from Hanover, Minnesota with their 135,000 subscribers—caused their severe emotional, physical, reputational, and business injuries because of ***their reporting*** related to the two scandals. And, remarkably, they allege that their injuries were suffered in Washington, despite the fact that they lived and conducted their business in Los Angeles and the fact, stated in the Complaint, that Halo is a Nevada corporation.

### III.   ARGUMENT

**A.     This Court may not exercise personal jurisdiction over Plaintiffs.**

**1.     Applicable standards and burden-shifting**

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler v. Bauman*, 571 U.S. 117, 125 (2014). Washington's long-arm statute

---

DEFENDANTS' MOTION TO DISMISS - 7

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

extends the court's personal jurisdiction to the broadest reach that the United States Constitution permits. *Byron Nelson Co. v. Orchard Management Corp.*, 95 Wn. App. 462, 465 (1999). Therefore, this Court must determine whether the exercise of jurisdiction here "comports with the limits imposed by federal due process." *Daimler*, 571 U.S. at 125 (2014).

The exercise of jurisdiction over a non-resident comports with due process only if the defendant has "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945). Under that standard, a defendant's conduct and connection with the forum state must be such that he should reasonably anticipate being hauled into court within the state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

"Minimum contacts are shown if the defendant has continuous and systematic general business contacts with a forum state (general jurisdiction), or if the defendant has sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)." *Morrill v. Scott Financial Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017) (quotations omitted). There is no question that this Court lacks general jurisdiction over Defendants. Ms. Paulson is a citizen and resident of Minnesota, and Without A Crystal Ball LLC is incorporated and has its principal place of business in Minnesota. Paulson Decl., ¶ 3. Ms. Paulson has never set foot in Washington State, other than one family vacation here in 1990. *Id.* She is unaware of Defendants having any sponsors or subscribers in Washington. *Id.* Plaintiffs do not and cannot reasonably allege there is general personal jurisdiction over Defendants.

Plaintiffs do allege specific jurisdiction. The Ninth Circuit applies a three-part test to determine whether a defendant has sufficient contacts to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or

DEFENDANTS' MOTION TO DISMISS - 8

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

> resident thereof; or perform some act by which he purposefully
> avails himself of the privilege of conducting activities in the
> forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the
> defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and
> substantial justice, i.e. it must be reasonable.

*Id.*

Courts applying the first part of this test in tort cases such as this, ask whether the defendant "purposefully directed" the allegedly tortious conduct toward the forum state. *Id.* at 1142-43. "Purposeful direction" requires "(1) an intentional action, (2) expressly aimed at the forum state, which (3) cause harm "the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1485–86 (9th Cir. 1993) (*citing Calder v. Jones*, 465 U.S. 783, 788–89 (1984)). "Failing to sufficiently plead any one of these three elements is fatal to Plaintiff's attempt to show personal jurisdiction." *Rupert v. Bond*, 2014 WL 4775375, at *14 (N.D. Cal. Sep. 22, 2014). And "mere bare bones assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden." *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007) (internal quotations omitted). In applying this test, the Court must "look[ ] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

Plaintiffs bear the burden of satisfying the first two prongs of the test. *Morrill,* 873 F.3d at 1142. If they fail to satisfy either of these prongs, "personal jurisdiction is not established in the forum state." *Id.* If and only if Plaintiffs succeed in satisfying both of the first two prongs, the burden then shifts to Defendants to demonstrate that the exercise of jurisdiction would not be reasonable. *Id.*

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

**2.      The Complaint contains no allegations even suggesting this Court may exercise personal jurisdiction with respect to Plaintiff Halo's claims.**

Plaintiffs allege that this Court has personal jurisdiction over Defendants because "they committed torts within this State" because they "directly targeted ***Plaintiffs***, who are residents of this District, with their tortious activity." Dkt. 1 at ¶ 8 (emphasis added). The Complaint defines "Plaintiffs" to include the Westbrooks ***and*** Halo. *Id.* at ¶ 3. But the Complaint itself disproves the assertion that Halo is a "resident of this District." Instead, it is alleged to be "a Nevada limited liability company with its principal place of business in Nevada." *Id.*

"Personal jurisdiction must be established for each defendant ***and by each plaintiff***." *Prime Healthcare Centinela, LLC v. Kimberly–Clark Corporation*, 2016 WL 7177532 at *1 (C.D. Cal. May 26, 2016) (emphasis added) (citing Rutter Group Practice Guide: Federal Civil Procedure Before Trial Ch. 3–E (2016)). As such, even if the Westbrooks' allegations regarding ***their*** domicile are correct (they are not), and even if such allegations would suffice to establish jurisdiction with respect to ***their*** claims (they would not), they do not even arguably support the exercise of personal jurisdiction with respect to Halo's claims. The allegation that Halo is a resident of Washington is not only inaccurate, it is frivolous. The Complaint contains nothing else to suggest that this Court may exercise personal jurisdiction over Defendants with respect to Halo's claims. Those claims must be dismissed.

**3.      The allegations of the Complaint, even taken as true, do not establish personal jurisdiction with respect to the Westbrooks' claims.**

**a.      Plaintiffs' allegations do not satisfy the "expressly aimed" requirement.**

Plaintiffs' allegations, even taken as true, do not satisfy the second requirement of the purposeful direction test, that Defendants "expressly aimed" their conduct as Washington State. Again, the sole allegation in the Complaint aimed at satisfying the minimum contacts test is the conclusory assertion that Defendants "committed torts within the State of Washington" because they "directly targeted Plaintiffs, who are residents of this District, with their tortious activity."

DEFENDANTS' MOTION TO DISMISS - 10

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

Dkt. 1, ¶ 8. However, as this Court recently recognized, the plaintiff's residency "is not the proper focus of an express aiming inquiry," because "mere injury to a forum resident is not a sufficient connection to the forum . . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the ***defendant's conduct*** connects him to the forum in a meaningful way." *National Products, Inc. v. Mamiya America Corporation*, 2020 WL 1819870 at *3 (W.D. Wash. April 10, 2020) (Rothstein, J.) (emphasis added) (citing *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

Much later in their Complaint, in the context of attempting to establish the falsity of an allegedly defamatory statement, Plaintiffs allege in conclusory fashion that Defendants "knew" Plaintiffs had "moved to the state of Washington in 2018 and became permanent residents there in 2019" because Ms. Paulson "has made mention of Tati's move to Washington in certain of her videos." Dkt. 1, ¶ 36. This additional allegation does nothing to bolster Plaintiffs' assertion of personal jurisdiction, for two reasons.

First, this "bare bones" allegation is far too conclusory to meet the pleading requirement with respect to Defendants' alleged "knowledge" of the Westbrooks' residency. *Swartz*, 476 F.3d at 766. Plaintiffs' Complaint identifies videos created by Defendants as late as October 29, 2020—the day before the Complaint was filed and well after nearly all of the alleged defamatory statements were published. As such, the assertion that Defendants "mentioned" Tati's alleged move to Washington in "certain of her videos" is insufficient to support a plausible inference that they were aware that she was a resident of Washington ***at the time*** the allegedly defamatory statements were published, starting in May 2019. Further, Plaintiffs' failure to identify any specific statement by Defendants in any specific video is notable. They had access to these videos at the time they filed the Complaint. If any specific video included a specific statement establishing that Defendants knew of Ms. Westbrook's residency in Washington ***at a time relevant to the Complaint***, presumably they would have identified it in that pleading.

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

Second, *Walden* established that the "expressly aimed" standard is ***not*** satisfied merely because a defendant knew that a plaintiff resided in the forum at the time of the alleged defamation. Prior to 2014, the law in the Ninth Circuit was that the "expressly aimed" requirement ***could be*** satisfied based on this alone. This was referred to as the "individualized targeting" test. *See, e.g.*, *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082 (9th Cir. 2000). The last Ninth Circuit opinion applying that doctrine was *Fiore v. Walden*, 688 F.3d 558, 577 (9th Cir. 2012). But the Supreme Court reversed that ruling in *Walden v. Fiore*, 571 U.S. 277, 288-89 (2014), holding that express aiming at a plaintiff, knowing he or she was a forum resident, was ***not*** enough to satisfy due process. Something more is required. The Court reasoned that to permit the exercise of personal jurisdiction on this basis "impermissibly allows a ***plaintiff's*** contacts with the defendant and forum to drive the jurisdictional analysis," thereby "improperly attribute[ing] a plaintiff's forum connections to the defendant and mak[ing] those connections 'decisive' in the jurisdictional analysis." *Id.* at 285-86 (emphasis added); *see Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017) (*Walden* "made clear that we must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum."); *Picot v. Weston*, 780 F.3d 1206, 1215 (9th Cir. 2015) ("[W]e are guided by the Supreme Court's recent decision in *Walden.* There, the Court reinforced the traditional understanding that our personal jurisdiction analysis must focus on the defendant's contacts with the forum state, not the defendant's contacts with a resident of the forum."); *Microsoft Corp. v. Communications & Data System Consultants, Inc.*, 127 F. Supp.3d 1107, 1115 (W.D. Wash. 2015) (Martinez, J.) (noting that, in *Walden*, "the United States Supreme Court has expressly rejected the idea that a defendant's knowledge of a plaintiff's forum connections and the foreseeability of harm there are enough in themselves to satisfy the minimum contacts analysis.").

The "something more" requirement may be satisfied in defamation cases where, for example: (1) the defendant developed the defamatory story using sources from the within the

DEFENDANTS' MOTION TO DISMISS - 12

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

forum; (2) the story focused on the plaintiff's activities within the forum; (3) the defamatory article had its widest circulation in the forum; and (4) the article was targeted specifically at an audience in the forum. *Walden*, 571 U.S. at 286-87 (observing that personal jurisdiction was proper in a previous case, *Calder v. Jones*, 465 U.S. 473 (1984), **only because** of these "plus" factors). Here, however, Plaintiffs make no allegations that remotely satisfy the something more requirement. And, in fact, they will be unable to do so. Paulson Decl., ¶ 5. Their allegations demonstrate that Defendants found the "sources" for their allegedly defamatory publications from court records in California and Hawaii, and the publications concerned Plaintiffs' conduct within those two states as well as Nevada (where Plaintiff Halo is incorporated and resides). There is no allegation of targeting a Washington audience. Indeed, there is no allegation of ***any*** connection between Defendants and Washington, except for the Westbrooks' alleged residency here. That is not enough. *See Western States Hockey League Inc. v. Doungchak*, 2016 WL 5886901 (C.D. Cal. March 7, 2016) (no personal jurisdiction in California where there was no allegation that the defendants' allegedly defamatory internet-based commentary was targeted specifically at a California audience); *Smart Energy Today, Inc. v. Hoeft*, 2016 WL 8200432 (C.D. Cal. June 20, 2016) ("Here, Plaintiff claims that Daly posted libelous and defamatory materials online, which harmed Plaintiff's business—including its business in California. The comments posted on AngiesList.com and Yelp.com are available to anyone in the United States with Internet access, but there is no allegation that Defendants encouraged California residents to access the sites or that they targeted California residents in any way.").

> b. **Plaintiffs fail to allege they suffered the "brunt of the harm" here.**

The Complaint must be dismissed for the additional reason that Plaintiffs fail to allege that "the brunt" of their alleged harm was suffered in Washington or that Defendants knew the brunt would be suffered here. *Core-Vent*, 11 F.3d at 1485–86. The only allegations arguably touching on this requirement are those discussed above, that the Westbrooks "moved to" Washington in 2018 and became permanent residents in 2019, and that Defendants "mentioned"

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

that move at some point before October 30, 2020. Here again, those allegations do not give rise to a plausible inference that Defendants knew that Plaintiffs had moved from Los Angeles to Washington, ***at a time*** when the alleged injuries occurred. Further, the mere fact that the Westbrooks recently moved to Washington does not say anything about where the "brunt" of any alleged harm was suffered. The business—Plaintiff Halo—is incorporated and resident in Nevada. Dkt. 1 at ¶ 3. There is no allegation that it conducted ***any*** business or suffered ***any*** injury in Washington, let alone the brunt of injury. Nor is there any allegation that the Westbrooks conducted any business or other remunerative activity here or earned (or lost) money from Washington sources, such as sponsors or business opportunities.

### 4. The allegations of the Complaint are contradicted by the Westbrooks' own public statements regarding their state of residence.

The Complaint alleges that Defendants defamed Plaintiffs during the period May of 2019 through October of 2020. As noted above, the Westbrooks allege, as the sole basis for personal jurisdiction over Defendants, that "[a]t all times relevant to this Complaint" (that is, from May 2019 through October 2020) they resided and were domiciled in Washington, and that they "moved to" Washington in 2018 and became "permanent residents" here in 2019. Dkt. 1 at ¶¶ 1, 2, 36. These allegations are almost certainly false.

"A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return." *Kanter v. Warner–Lambert Co*., 265 F.3d 853, 857 (9th Cir. 2001) (citing *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir.1986)). A person can have only one domicile at a time. As such, having established a domicile in California for years leading up to 2018, the Westbrooks are presumed to have continued to be domiciled there unless and until they provide evidence establishing that Washington became their new domicile. *Lew*, 797 F.2d at 750. "A change in domicile requires the confluence of (a) physical presence at the new location with (b) an intention to remain there indefinitely." *Id.* Relevant factors include residence,

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

business activities, vehicle registration, property ownership, voting, and payment of taxes. *See* 13B C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3613 (2020).

The Complaint includes nothing but conclusory allegations regarding residence and domicile. That is not sufficient. A party's self-serving declaration regarding change of domicile is to be regarded with skepticism and disregarded when inconsistent with the facts. *See id.* *A fortiori*, the Westbrooks' unsworn and conclusory allegations should be given no weight at all. The Westbrooks' failure to include specific allegations to support their assertion of residence and domicile in Washington as of May 2019 is telling, in light of the fact that their domicile prior to that time was clearly Los Angeles, and that they must know they are required to overcome the presumption of the continuation of that domicile. And, in fact, there is substantial evidence that the Westbrooks' assertions in this Court are false, and that they changed their domicile to Washington, if at all, no earlier than March of 2020.

First, according to Zillow.com, the Westbrooks did not list their Los Angeles home for sale until September 2020. Brown Declaration, ¶ 2. Second, their business partner Clark Swanson, under penalty of perjury in his verified complaint in Los Angeles County Superior Court, stated that the Westbrooks "resided in Los Angeles County and were citizens of California" *from 2016 through the filing of his complaint, in October 2020*. RJN, Appx. A, ¶ 4. Third, Ms. Westbrook herself left a long and public trail of evidence in the form of social media posts from late 2019 and early 2020. These establish, in Ms. Westbrook's own words, that Los Angeles—not Washington—was her home at that time (all emphases added):

- Ms. Westbrook stated in an August 19, 2019 tweet: "Back in LA . . . Excited *to get home* to snuggle with Puka [her dog]." Brown Decl., ¶ 3. If Ms. Westbrook had in fact "moved" to Washington in 2018 and established domicile here by May 2019, presumably she would not be referring to Los Angeles as "home" in August 2019 (and presumably her dog would not have been living in her Los Angeles "home" at that time).

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

- On November 7, 2019, in response to an invitation to attend a charity event near her home in Los Angeles, Ms. Westbrook responded: "I'm ***out of town*** with family or else I'd be there." *Id.*, ¶ 4. Ms. Westbrook was in Seattle on that date, visiting her sister Erika, who was in the hospital here. *Id.*, ¶ 4. If Ms. Westbrook had "moved to" Seattle in 2018 and established domicile here by May 2019, she would not, in November 2019, be referring to Seattle as "out of town."

- Ms. Westbrook stated, in a March 2020 YouTube video, that when she "***first got here to Seattle***" she posted tweets about COVID and received online blowback for being too alarmist about the COVID threat. Def's RJN, Appx. B-13 (at 11:00 – 11:30). Of course, the COVID crisis did not begin to materialize until early 2020, which means Ms. Westbrook admitted she "first got to Seattle" in or about March 2020. In that same video, Ms. Westbrook describes the strange new experience of being in Seattle and away from Los Angeles. *Id.* (at 00:01 - 00:40).

- Ms. Westbrook stated, in her June 30, 2020 video *Breaking My Silence*, that in the fall of 2019, "I became so afraid to stay ***in my L.A. home*** that I made a lot of videos and left town in October." *Id.*, Appx. B-8 (at 29:12).

- After years of living in Los Angeles with Mr. Westbrook, on December 11, 2019, Ms. Westbrook sent a cryptic tweet saying: "Ready for the next chapter." Brown Decl., ¶ 5. On December 15, 2019—***one year or more*** after the date on which she now claims she moved back to Seattle—Ms. Westbrook posted a photo on Instagram of herself in Seattle with the announcement: "Seattle . . . I'm back and I'm here to stay." *Id.*, ¶ 6. That announcement caused a splash in the media and among her followers and fans, and speculation about the reason for the surprising move. It is implausible that a prominent Los Angeles-based "internet personality, celebrity, and influencer," as Ms. Westbrook describes herself in the Complaint, could have "moved to Washington" from Los Angeles in 2018, and lived there for at least one

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

year, without the notice of the media or her fans, so as to make the December 2019

"announcement" a surprise in that community.

- Ms. Westbrook then stated in a December 16, 2019 tweet that "I am not ***moving to***

  ***Seattle*** without my husband." *Id.*, ¶ 7. Had the Westbrooks "moved" to Washington

  in 2018 and established domicile her by May 2019, Ms. Westbrook would not have

  referred to "moving" in the future tense (or present continuous tense) in December

  2019.

The factual basis for the Westbrooks' assertion of Washington domicile as of May 2019

is contradicted by this publicly-available evidence. Defendants expect that non-public evidence

such as banking, voting, tax, vehicle registration, and travel records are consistent with

Ms. Westbrook's public statements and would disprove the assertions in the Complaint.

**B.      The Complaint must be dismissed for lack of diversity jurisdiction.**

Plaintiffs bring this lawsuit against Defendants, who are Minnesota residents, and 100

DOE defendants. They do not allege the state of residence for any of these 100 defendants. As

such, this Court lacks diversity jurisdiction and all claims should be dismissed. *See Fineman v.*

*Lutz-Laidlaw Partnership*, 2020 WL 1905783 at *2 (S.D. Cal. April 17, 2020) ("Plaintiffs have

not alleged the citizenship of any of the Doe Defendants, whether business entities or

individuals. Failure to do so destroys diversity jurisdiction." (citing *Garter-Bare Co. v.*

*Munsingwear, Inc.*, 650 F.2d 975, 981 (9th Cir. 1980)). Plaintiffs' failure to name ***any*** of these

100 allegedly "unknown" defendants is especially troubling, in light of their very public

allegations in June of 2020—which were "approved" by their "legal team"—that Dawson and

Starr were the ***leaders*** of the conspiracy that led to *Dramageddon 2.0* and caused their mental,

physical and business injuries.

DEFENDANTS' MOTION TO DISMISS - 17

**GORDON**
**TILDEN**
**THOMAS**
**CORDELL**

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

**C.  Plaintiffs failed to join necessary parties they have already identified as the cause of the damages they seek here.**

Rule 19(a) of the Federal Rules of Civil Procedure provides that any person "subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties." The "complete relief" described in Rule 19(a)(1)(A) "is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 557 (W.D. Wash. 2018) (Leighton, J.) (quoting *Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013)). If a person has not been joined as required, "the court must order that the person be made a party." *Id.* "If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.*

Where a plaintiff asserts injuries for which multiple defendants could be proportionately, as opposed to jointly and severally liable, each of those defendants is a necessary party under Rule 19. *See Abuhouran v. Kaiserkane*, 2012 WL 4027416 at *7 (D. N.J. Sept. 12, 2012). Here, Plaintiffs, with the approval of their lawyers, publicly accused Dawson and Starr of orchestrating *Dramageddon 2.0* and the blowback from that incident, which allegedly caused Plaintiffs' injuries—the same injuries for which they have since sued Defendants. In the absence of these parties, this Court will be unable to afford complete relief. *Id.*

Plaintiffs make no attempt to explain why they have not joined in this action the very parties who they and their attorneys have held publicly accountable for their alleged injuries, especially when those parties have massive public followings (compared to Defendants), and Plaintiffs made ***no mention*** of Defendants in their very lengthy and public YouTube accusations.

DEFENDANTS' MOTION TO DISMISS - 18

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

**D.    The Complaint fails to state a claim for intentional infliction of emotional distress.**

Under both California and Washington law, to plead a claim for intentional infliction of emotional distress ("IIED"), the Westbrooks must allege specific facts sufficient to permit a plausible inference that: (1) Defendants engaged in extreme and outrageous conduct, (2) Defendants intentionally or recklessly inflicted emotional distress on them, and (3) Defendants' conduct resulted in them suffering "severe" emotional distress. *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009); *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 250 (2001); *Trivedi v. U.S. Department of Homeland Security*, 711 Fed. Appx. 827 (9th Cir. Oct. 3, 2019) (unpublished) (applying *Iqbal*/*Twombly* standard to IIED claim). The Westbrooks claim should be dismissed because they fail adequately to plead either the first or third element.

**1.    The Westbrooks fail to plead "extreme and outrageous" conduct.**

"Extreme and outrageous" conduct "does not extend to mere insults [or] indignities . . . but only to conduct so extreme and outrageous as to go beyond all possible bonds of decency." *Plater v. United States*, 359 F. Supp.3d 930, 942 (C.D. Cal. 2018); Restatement (Second) of Torts, § 46 cmt. d (2020). "In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Kloepfel v. Bokor*, 149 Wn.2d 192, 196 (2003). With respect to Ms. Westbrook, Plaintiffs allege that Defendants posted statements to social media that she is a "liar," is "manipulative," is selling "snake oil" and "junk vitamins," "is not necessarily following the rules," is a "con-artist," is disappointed in the sales of her vitamins, and is "not honest." Even assuming these statements were made and were false, they are nothing more than insults; as a matter of law they are not "extreme and outrageous." *Id.*

Plaintiffs also allege that Defendants reported on allegations made against both Westbrooks in several ***publicly-available*** lawsuits against them. Those suits allege fraud, "malicious and willful" misconduct, wrongful diversion of assets, Ms. Westbrook's contempt for her customers and fans, and (with respect to Mr. Westbrook) overreaching conduct in regard to an elderly relative's estate. *See, e.g.*, Dkt. 1 at ¶¶ 32-37. Plaintiffs allege that Defendants reported

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

from these public records without making it clear that they were allegations and not facts. But as a matter of law the mere reporting of allegations from public documents cannot be "extreme and outrageous," even assuming, *arguendo*, that Defendants did not sufficiently couch them as allegations, and such that such an omission could support a claim for defamation.

### 2.    The Westbrooks fail adequately to allege "severe" emotional distress.

The Westbrooks allege that, because of Defendants' conduct, they suffered "severe emotional distress" such as "loss of sleep, anxiety, depression, nausea, loss of appetite, loss of weight, fear, sense of helplessness, and despair." Dkt. 1 at 96. These are the same symptoms Ms. Westbrook blamed on Starr and Dawson in her attorney approved *Breaking My Silence*. In any event, the conclusory recitation of such symptoms is not sufficient to meet federal pleading standards. *See McTimmonds v. Alcohol & Drug Testing Services*, LLC 2014 WL 6835636 (E.D. Cal. Dec. 3, 2014) (citing *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009)) ("Plaintiff alleges . . . he suffered 'anguish, humiliation, discomfort, worry, anxiety, annoyance, and severe emotional distress' . . . The Complaint is silent, however, as to whether the distress was enduring. Under *Iqbal*, the conclusory allegation that plaintiff suffered severe emotional distress is insufficient."); *see also Lawler v. Montblanc N. Am. LLC*, 704 F.3d 1235, 1246 (9th Cir. 2013) (plaintiff's emotional injuries such as anxiety, sleeplessness, upset stomach, and muscle twitches "clearly" did not rise to the level of "severe"). At minimum, a plaintiff must plead that such symptoms were so severe or enduring that "that no reasonable [person] in civilized society should be expected to endure it." *McTimmonds*, 2014 WL 6835636 at *6. Plaintiffs have failed to meet that pleading standard.[2]

---

[2] Washington law also requires that the emotional distress be "severe," for negligent and intentional infliction of emotional distress. *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989).

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

**E.      The Complaint fails to state a claim for negligent infliction of emotional distress.**

Plaintiffs' claim for negligent infliction of emotional distress fails because, as discussed above, they have not adequately alleged "severe" emotional distress. *McTimmonds*, 2014 WL 6835636 at *5 ("Serious emotional distress required for an NIED claim absent threat of physical harm is functionally the same as the articulation of 'severe emotional distress' required for an IIED claim."). Further, to the extent Washington law would apply to this claim, it fails for the additional reason that Plaintiffs fail to plead that Defendants' conduct resulted in a medically diagnosable mental or emotional disorder, such as "neuroses, psychoses, chronic depression, phobia, post-traumatic stress disorder, or any other disabling mental condition." *See Hegel v. McMahon*, 136 Wn.2d 132, 135 (1998) (emphasis added). Plaintiffs' alleged symptoms may be ***consistent with*** such a diagnosable mental disorder, but they are also consistent with transient symptoms suffered in the absence of one. *Haubry v. Snow*, 106 Wn .App. 666, 678-79 (2001) (symptoms like nightmares, loss of sleep, fear, and intrusive memories do not support a claim unless they "constitute a diagnosable emotional disorder"). Federal pleading standards require more. *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 501 (9th Cir. 2019) (allegations that are merely "consistent with" defendant's liability are insufficient under *Iqbal*/*Twombly*).

**F.      The Complaint fails to state a claim under the Washington CPA.**

**1.      The Complaint fails adequately to allege "injury to the public."**

A plaintiff may not state a claim for a Consumer Protection Act violation unless he or she alleges facts that give rise to a plausible inference that the claim "would serve the public interest by addressing acts or practices that are injurious to the public." *Shugart v. GYPSY Official No. 251715*, 2015 WL 1965375 at *2 (W.D. Wash. May 1, 2015) (citing *Michael v. Mosquera–Lacy*, 165 Wn.2d 595, 605 (2009); *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986) (The Act "shall not be construed to prohibit acts or practices which . . . are not injurious to the public interest.")). "Injury to the public" is difficult to show where, as

DEFENDANTS' MOTION TO DISMISS - 21

**GORDON
TILDEN
THOMAS
CORDELL**

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

here, the dispute does not concern a consumer transaction. *Id.* (citing *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744 (1997).

Plaintiffs' Complaint contains nothing but the barest conclusory recitation regarding the "injury to the public" requirement. *See* Dkt. 1 at ¶ 107 (alleging that Defendants' practices "affect the public interest because they had, or have, the capacity to injure other persons as described in this Complaint."). They fail to identify ***any*** "other person" allegedly injured or threatened with injury by Defendants' conduct, let alone any Washingtonian. Plaintiffs' "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Shugart*, 2015 WL 1965375 at *2 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### G.   The Complaint fails to state a claim for civil harassment under RCW 10.14.020.

Plaintiffs' Complaint fails to state a claim for Civil Harassment under RCW 10.14.020, for a slew of reasons. First, that statute is part of the Washington Criminal Procedure Code; it is not the basis for a federal civil cause of action. Indeed, the statute's "Jurisdiction" provision vests jurisdiction in the ***State's*** district courts, municipal courts, and superior courts. RCW 10.14.150; *see Cariega v. City of Reno*, 2017 WL 3299030 at *1 (D. Nev. Aug. 2 2017) (refusing to exercise subject matter jurisdiction over plaintiff's putative "claim" under Nevada statute, where statute set forth procedure to enforce public records act request in state court).  And the statute sets forth detailed procedural mechanisms tailored specifically to the state judicial and criminal justice system. RCW 10.14.040-110.  In *Barberio v. City of Burien*, 2006 WL 2237704 (W.D. Wash. August 3, 2006) (Pechman, J.), the court rejected the notion that this state criminal procedural statute could be turned into a federal civil claim:

> Plaintiff's request for a protection order appears to be based on provisions of Washington state law that permit victims of harassment or domestic violence to obtain protection orders. *See* RCW 10.14 and 26.50. Unlike Washington state law, there is no federal statute that authorizes the issuance of a "Federal Protection Order." Therefore, this claim will be dismissed for failure to state a

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

claim on which relief may be granted. This dismissal is without prejudice to Plaintiff seeking protection orders ***as authorized by Washington law in Washington state courts.***

(Emphasis added); *see also Peace v. Kerlikowske*, 2005 WL 8165815 at *6 (W.D. Wash. April 12, 2005) ("The procedure for obtaining an ex parte temporary anti-harassment protection order is to petition the State district court for the desired order.").[3]

Second, the statute states that the request for relief thereunder "shall be accompanied by an affidavit made under oath stating the specific facts and circumstances from which relief is sought." RCW 10.14.040. The Westbrooks filed no such "affidavit under oath." This failure even to attempt to satisfy the clear statutory requirement suggests the Westbrooks are unable to make necessary allegations "under oath." In any event, it is fatal to the attempted cause of action.

Third, the statute defines "unlawful harassment" as "knowing and willful course of conduct directed ***at*** a specific person . . ." RCW 10.14.020(2) (emphasis added). The materials on which Plaintiffs' Complaint are based were not directed "at" the Westbrooks. Rather, they were ***about*** the Westbrooks. They were "directed at" Defendants' general social media audience. While Plaintiffs recite the phrase "directed at Plaintiffs" in their Complaint, they fail to allege any facts that would plausibly support such an inference. Indeed, they do not—and cannot— allege that Defendants even attempted to make contact with them in any manner whatsoever. This is a critical distinction. The statute is aimed at harassing "contact" between the parties. *See* RCW 10.14.10 ("This chapter is intended to provide victims with a speedy and inexpensive method of obtaining civil antiharassment protection orders preventing all further unwanted ***contact between the victim and the perpetrator***.") (emphasis added); RCW 10.14.030 (the court considers who initiated "any current ***contact*** between the parties"; whether there was "clear notice that all further ***contact*** . . .is unwanted"; and whether "***contact*** by the respondent with the petitioner" has been previously limited by court order) (emphases added). While that contact

---

[3] One court in this District concluded it had "concurrent" jurisdiction, with the state courts, to entertain a claim under RCW 10.14.020. *Ferguson v. Waid*, 2018 WL 5734662 at *1 (W.D. Wash. Nov. 2, 2018) (Martinez, J.). However, that finding was unsupported by any analysis, and Defendants respectfully contend it was incorrect.

DEFENDANTS' MOTION TO DISMISS - 23

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

need not be face-to-face and may be by electronic means, there is no authority for the proposition that general internet publications not directed "at" the plaintiff fall within the scope of the statute.

Fourth, the statute requires that Plaintiffs show that Defendants had a "continuity of purpose" to harass them. RCW 10.14.020(1). *City of Seattle v. Megrey*, 93 Wn .App. 391, 397 (1998) ("To obtain an antiharassment order under RCW 10.14, a petitioner must prove a respondent engaged in a "knowing and willful" course of conduct. RCW 10.14 requires the court to engage in ***a subjective analysis and find this purposive element in a person's activities*** in order to proscribe otherwise legal activities.") (emphasis added). Not only have the Westbrooks failed to allege facts supporting this requirement, they explicitly admit that Defendants' "sole purpose" was something entirely different. The allege that Defendants acted with "the sole purpose of enticing followers and viewers to help Defendants monetize Defendant Paulson's pages and channels on her various social media platforms." Dkt. 1 at ¶ 14. A complaint cannot give rise to a plausible inference of a specific purpose to harass, when the complaint itself alleges a "sole purpose" to attract viewers and subscribers.

Plaintiffs' failure adequately to allege that Defendants acted with the specific purpose of harassing them implicates the very constitutionality of this statute. It is the *mens rea* requirement that keeps the statute from unconstitutionally criminalizing "pure speech," that is, prohibiting speech based only on its content. *State v. Nguyen*, 10 Wn. App.2d 797, 811 (2011) ("Nguyen's [First Amendment] argument ignores that a violation of the stalking statute is not based on the content of pure speech. [T]he statute has ***an important mens rea element***: the harassment provision of the stalking statute is only violated based on an intentional course of conduct that seriously alarms, annoys, harasses, or is detrimental to the victim. This intentional course of conduct is not protected by the First Amendment.") (emphasis added).

## IV.  CONCLUSION

The defects in Plaintiffs' Complaint are numerous, clear, and fatal. This Court should dismiss this action.

DEFENDANTS' MOTION TO DISMISS - 24

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

DATED this 2nd day of December, 2020.

**GORDON TILDEN THOMAS & CORDELL** LLP
Attorneys for Defendants Kathryn Manske Paulson and
Without A Crystal Ball, LLC

By     s/ *Michael P. Brown*
     Michael P.  Brown, WSBA #45618
     600 University Street, Suite 2915
     Seattle, Washington 98101
     206.467.6477
     mbrown@gordontilden.com

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477