The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TATIANA WESTBROOK, an individual; JAMES WESTBROOK, an individual; HALO BEAUTY PARTNERS, LLC, a Nevada Limited Liability Company,<br><br>Plaintiffs,<br><br>v.<br><br>KATIE JOY PAULSON, an individual; WITHOUT A CRYSTAL BALL, LLC, a Minnesota Limited Liability Company; and DOES 1 through 100, inclusive,<br><br>Defendants. | NO.  2:20-cv-01606 BJR<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS** |

DEFENDANTS' REPLY ISO MOTION TO DISMISS

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

# I. ARGUMENT

**A.  Plaintiffs fail to demonstrate a basis to assert personal jurisdiction over Defendants.**

**1.  Plaintiffs fail to demonstrate that Defendants "purposefully directed" their conduct at Washington under the "effects test."**

In cases alleging intentional torts where allegedly tortious conduct takes place outside the forum and has effects inside the forum, the Ninth Circuit examines purposeful direction using an "effects test" based on *Calder v. Jones*, 465 U.S. 783 (1984). This test has three elements: the defendant allegedly must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (quotations omitted). Defendants concede that they are alleged to have committed "intentional" acts. However, Plaintiffs failed to allege or present evidence that Defendants expressly aimed their conduct at Washington. As explained below, Plaintiffs make no attempt to establish that the focus of alleged harm was in Washington. And the "contacts" they do identify are plainly insufficient to establish express aiming here. Dkt. 27 at 10:5-13.

**a.  Plaintiffs make no attempt to show that Washington was the focus of the alleged harm arising from Defendants' publications.**

**1)  The "focus" or "brunt" of the harm remains a critical factor in the "effects-express aiming" analysis.**

Plaintiffs' "effects-express aiming" argument is most notable for its failure even to attempt to show that the alleged harm from Defendants' publications was focused in Washington, or even that a substantial amount of harm was suffered here. This omission appears to be explained by Plaintiffs' overreading of the Ninth Circuit's 2006 holding in *Yahoo! Inc. v. La Ligue Contre Racisme et Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006). Prior to *Yahoo!*, the Ninth Circuit had sometimes stated the third element of the "effects test"—foreseeable harm in the forum—as requiring that the defendants' conduct have "caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum

state." *Id.*, (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). In *Yahoo!*, the Court clarified that this *third* element contained no such requirement:

> In some of our cases, we have employed a slightly different formulation of the third requirement, specifying that the act must have caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state. We take this opportunity to clarify our law and to state that the "brunt" of the harm need not be suffered in the forum state.

*Yahoo!*, 433 F.3d at 1206-07. Instead, the Court held, the third element required only that the plaintiff have suffered a "jurisdictionally sufficient amount of harm" in the forum. *Id.* at 1208.

Contrary to Plaintiffs' suggestion, *Yahoo!* did not remove the "brunt of harm" factor from the purposeful direction-effects analysis; it only clarified that it was not required under the *third* element of that analysis. *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1131 (9th Cir. 2010) (observing that *Yahoo!* clarified that "*the final element*" of the "effects" test did not require that the brunt of harm be felt in the forum) (emphasis added) (*abrogated on other grounds by Axiom Foods*, 874 F.3d at 1069). Recent Ninth Circuit rulings make it clear that, in cases involving allegedly tortious publications arriving in the forum from outside the forum, the "focus" of harm remains highly relevant—indeed potentially dispositive—to the *second* prong of the effects test—"express aiming."[1]

In *Axiom Foods, Inc. v. Acerchem International, Inc*. 874 F.3d 1064, 1070-71 (9th Cir. 2017), the Court held that "express aiming" at California was not shown where the nonresident defendant emailed an allegedly copyright-infringing newsletter to 343 persons, 10 of whom were in California. Applying *Calder*, as more recently interpreted in *Walden v. Fiore*, 571 U.S. 277, 285 (2014), it reasoned that the express aiming requirement was not satisfied, because "most of the recipients" of the newsletter were outside the forum. As such, unlike in *Calder*, California was not "the *focal point* both of the [newsletter] *and of the harm suffered*." *Id.* (emphasis added) (*quoting Walden*, 571 U.S. at 285 (*quoting Calder*, 465 U.S. at 789)).

---

[1] Notably, Plaintiffs analyze purposeful direction for these internet-based claims exclusively under *Calder* and *Keeton*, both decided in 1984, years before the internet came into being.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS - 2

GORDON TILDEN THOMAS CORDELL | 600 University Street Suite 2915 Seattle, WA 98101 206.467.6477

Similarly, in *AMA Multimedia LLC v. Wanat*, 970 F.3d 1201, 1212 (9th Cir. 2020), the Court held that purposeful direction was not established over a publisher of internet pornography that had customers in the forum representing "nearly 20%" of its total audience. Indeed, the Court rejected the assertion of personal jurisdiction despite additional, significant connections between the defendant and the forum, including: (1) a substantial amount of the defendants' content was developed within the forum; and (2) the defendant used a forum-based company to facilitate the use of its website by residents of the forum. *Id.* at 1210-12. The Court concluded that the express aiming requirement was not satisfied, *because* the forum "was not the *focal point* of the website *and of the harm suffered.*" *Id.* (emphasis added) (*quoting Calder* and *Walden*).

Most recently, *in Janus v. Freeman*, --- Fed. Appx. ----, 2020 WL 7663439 at *2 (9th Cir. December 24, 2020), the Court applied *Calder* and *Walden* to hold that express aiming was not established, with respect to defamation and harassment claims arising from social media posts the defendant had *deliberately* sent exclusively to several California residents. It reasoned that, those connections notwithstanding, the plaintiffs failed to show that the "brunt" of the injury to their reputations was suffered in California:

> *In sharp contrast to Calder*, in which the defendants caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State *and in which the brunt of that injury was suffered by the plaintiff in that State . . .* Janus relies on only a handful of communications that Freeman made to (at most) a few Californians, and there is no evidence or even an allegation that these communications had reputation-based effects of the sort that would be sufficient to warrant haling Freeman into a California court.

*Id.* (quotations omitted). Because the plaintiffs' showing with respect to reputational injury in California was so weak, the Court concluded, plaintiffs had demonstrated "only an attenuated affiliation with the forum." *Id.* (quoting *Axiom Foods*, 874 F.3d at 1068 (9th Cir. 2017).[2]

---

[2] The majority ruling in *Janus* drew a lengthy dissent, but that dissent did not take issue with the majority's inclusion of the "focus of the injury" factor in the express aiming analysis. Indeed, the dissent observed that "the majority opinion correctly states the generally applicable law concerning personal jurisdiction." *Id.* at *4. It did

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS - 3

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

### 2) Plaintiffs' showing with respect to harm in Washington is "virtually nonexistent."

To establish harm occurring in Washington, Plaintiffs rely solely on declarations of *two* Washingtonians, who attest that they stopped purchasing Halo products after watching Defendants' videos, because the videos caused them to think less well of Plaintiffs. Importantly, this is two out of the "hundreds of thousands, if not millions" of viewers that are alleged to have watched those videos. Dkt. 1 at ¶ 26. Even taking these declarations at face value, they come nowhere close to supporting the assertion of personal jurisdiction here. *See Janus*, --- Fed. Appx. --, 2020 WL 7663439 at *2 (contrasting the receipt of publications by a "few" Californians (insufficient to establish express aiming) to the 600,000 copies of the National Enquirer circulated in *Calder* and that led to the "brunt of that injury" being suffered in California in that case); *Axiom Foods*, 874 F.3d at 1071 (receipt of allegedly infringing newsletter, sent *deliberately* to *ten* Californians out of 343 recipients, was insufficient to establish express aiming, in part because of a lack of harm focused in the forum); *AMA Multimedia*, 970 F.3d at 1212 (express aiming not established where 20% of the defendant's internet audience was located in the forum, because that was insufficient focus to show that the forum was the "focal point" of the harm). If "forum harm ratios" of 3% and 20% are insufficient to establish "focus" of harm within the forum, certainly the ratio here—two out of "hundreds of thousands if not millions"—means that harm in the forum is, in the words of the *Janus* Court, "virtually nonexistent" and shows "only an attenuated affiliation with the forum." *Janus*, --- Fed. Appx.---, 2020 WL 7663439 at *3.

### b. The alleged deliberate targeting of a resident of a forum does not constitute express aiming of conduct at that forum.

Plaintiffs continue to insist they were residents of Washington beginning in late 2018. As explained in Section 2 below, that assertion is conclusively refuted by Mr. Westbrook's own

---

disagree with the majority's application of that requirement to the facts, concluding that the defendants were alleged to have "caused harm which could *only* be felt in California." *Id.* at *8. (emphasis added).

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS - 4

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

*sworn* declaration in 2019 in another lawsuit, that he was living in California late in 2019, as well as a trove of other evidence. However, as Defendants explained in their Opening Brief, even if and to the extent Plaintiffs lived in Washington at the time of any alleged defamatory publications, and even if Defendants were aware of that, it would not support personal jurisdiction. *Janus*, --Fed. Appx.--, 2020 WL 7663439 at *2 ("In *Walden*, the Court expressly rejected the view that Calder's effects test is satisfied merely by the defendant's commission of an intentional tort that is aimed at a person known to be a resident of the forum state.").

### c.   Defendants did not use Washington "sources."

In *Calder*, the Court held that a California court could exercise personal jurisdiction over nonresident journalists, in part because they deliberately reached out to make telephone contact with persons *within* California in the process of sourcing their allegedly defamatory story. As such, they intentionally directed their conduct *at* the forum itself. *Calder*, 465 U.S. at 785. Plaintiffs do not even allege Defendants contacted any Washingtonian in the process of preparing their stories. Instead, they argue that Defendants used Washington "sources," within the meaning of *Calder*, merely by using general websites that collect information from all fifty states and post electronic images of state records. That argument plainly fails.

While in Minnesota, Defendants accessed and searched Ancestry.com and MyLife.com. Both of them are globally-available websites that collect records and information from all over the United States. Supplemental Declaration of Katherine Paulson, ¶¶ 2-3. Defendants were not searching "for" Washington records. *Id.* They were instead seeking information regarding the Westbrooks, from whatever source and from wherever it originated. *Id.* Indeed, Plaintiffs admit this when they argue that Defendants "researched everything and everywhere" in the process of preparing their stories about the Westbrooks. Dkt. 27 at 13: 9-10. It so happened that the results of that search included electronic images of records from Washington (as well as records from North Carolina, South Carolina, Nevada, Hawaii, and California). *Id.* Those images had been retrieved and stored—*by someone other than Defendants*—on the websites' respective servers.

Defendants did not purposefully direct or expressly aim their conduct "at" Washington by accessing these websites, any more than had they logged into Amazon.com from their Minnesota home to purchase a hard copy book about the Westbrooks' personal histories, and, once that book arrived in the mail, found images of these same historical records inside.[3]

### d. Purposeful direction is not established by Defendants' alleged receipt of negligible income from a negligible Washington audience.

Plaintiffs contend that Defendants had a Washington audience, were aware of its existence, and knowingly earned money from it. Dkt. 27 at 10:9-13. But the only evidence they offer in support of that statement establishes, at most, that: (1) *two* Washingtonians viewed the allegedly defamatory publications; (2) *three* Washingtonians viewed different videos that are not alleged to have any connection with this case;[4] and (3) *one* Washingtonian subscribed to Defendants' YouTube channel prior to the filing of this lawsuit. Dkt. 27-4 at ¶¶ 5-7; Dkt. 27-5 at ¶¶ 5-10; Dkt. 27-2 at ¶9; Dkt. 30-1.[5] This showing is feeble by any measure, but it is especially so when measured against Plaintiffs' assertion, that the allegedly defamatory videos were viewed by "hundreds of thousands, if not millions" of people. Dkt. 1 at ¶ 26. Indeed, in *Calder* and *Keeton*, the allegedly defamatory publications reached forum audiences of 600,000 (*Calder*) and between 50,000 and 75,000 (*Keeton*). *Calder*, 465 U.S. at 785, *Keeton*, 465 U.S. at 772; *see Walden*, 571 U.S. 287 (noting that the *Calder* holding was based in part on the circulation of 600,000 hard copies of National Enquirer magazines in California).

---

[3] In *AMA Multimedia*, 970 F.3d at 1210, the Ninth Circuit found it insufficient that a "significant portion" of the defendant's website content was generated from with the forum, because that did not show the defendant's conduct was "aimed at" the forum. That being the case, the fact that Defendants' allegedly defamatory publications included some historical facts derived from old Washington records, cannot establish "aiming" at Washington.

[4] Plaintiffs do not even *argue* these videos have anything to do with this lawsuit or with them at all. Further, Defendants receive literally hundreds of these chats each time they broadcast a video. Supp. Paulson Decl., ¶ 8. It is entirely irrelevant that a few Washington residents, in a few unrelated videos, decided on their own to reach out to Defendants' channel to chat.

[5] Plaintiffs rely on Mr. Westbrook's own declaration as support for the argument that Defendants derived income from "all views" within Washington of the allegedly defamatory content. Dkt. 27-2 at ¶¶ 5-14. But Mr. Westbrook provides no foundation for his alleged "expertise" and no basis for applying it to opine as to Defendants' revenues, from Washington or anywhere else. *See* FRE 602, 701, 702

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS - 6

GORDON TILDEN THOMAS CORDELL | 600 University Street Suite 2915 Seattle, WA 98101 206.467.6477

In addition to failing to come anywhere near the bar set by *Calder* and *Keeton*, Plaintiffs' argument is foreclosed by the Ninth Circuit's very recent holding in *AMA Multimedia*, 970 F.3d at 1212, that express aiming was not established where 20% of the defendants audience was inside the forum. The Court reasoned that there was no showing that the defendant had specifically targeted the forum, as opposed to *generally* circulating and promoting its website in a manner that would necessarily lead to it garnering an audience and customers there. The same is true here, but even more so. There is no evidence that Defendants had a Washington audience *anywhere near* 20% of their total audience. *See* Supp. Paulson Decl., ¶ 4 (Washingtonians make up .07% of Defendants' subscribers). Nor does this case involve the additional, substantial connections that the *AMA Multimedia* Court rejected as bases for jurisdiction.

While ignoring all recent authority governing personal jurisdiction in cases involving internet torts, Plaintiffs rely *exclusively* on *Keeton* in support of their "Washington audience" argument. Dkt. 27 at 14:20 – 15:21. In *Keeton*, the Court held that a New Hampshire court could exercise personal jurisdiction over Hustler magazine, because Hustler deliberately circulated between 50,000 and 75,000 hard copies of the allegedly defamatory magazine in that state. *Keeton*, 465 U.S. at 772. Plaintiffs contend that, like the defendants in *Keeton*, Defendants here "circulated their defamatory content to viewers in Washington and derived income through all the views of that content in Washington." Dkt. 27 at 14. However, the critical fact in *Keeton* was that Hustler magazine *deliberately mailed* tens of thousands of hard copies of the offending magazines to readers in the forum state. Nothing like that is alleged here. Rather, what Plaintiffs allege is the mere *receipt* of Defendants' internet publications *by* at most a handful of Washingtonians, which resulted from Defendants' general, untargeted, and global dissemination of their videos. That is not jurisdictionally significant. *AMA Multimedia*, 970 F.3d at 1210-12. Indeed, in *Axiom Foods,* 874 F.3d at 1071, the Court applied *Keeton* to hold that a California court could not exercise personal jurisdiction over a U.K. defendant, despite the fact that it had *deliberately* sent the offending newsletter to ten California residents (out of 343 total recipients).

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS - 7

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

The Court reasoned that this was too small a connection between the defendants, the suit, and the forum to constitute purposeful direction under *Walden*.

Plaintiffs argue that *Keeton* stands for the proposition that defamation claims may be brought in any forum where even one person views the allegedly defamatory material. Dkt. 27 at 12:10-13. That argument is foreclosed by *Janus*, *Axiom Foods*, and *AMA Multimedia*. All those cases involved the receipt and viewing of the allegedly tortious publications within California (indeed, they all involved purposeful targeting of California with those communications), and the Court ruled in each that personal jurisdiction could not be asserted. Several other courts have applied the same rule, that purposeful direction is not satisfied where, as here, persons within the forum received allegedly defamatory material, with the defendant's knowledge, but resulting only from the defendant's general, untargeted internet publication.[6] Supp. Paulson Decl., ¶ 5.

### e. Jurisdiction is not supported by the fact that Defendants "discussed" Plaintiffs' "Washington connections" or "activities."

Plaintiffs argue personal jurisdiction is supported by the fact that Defendants discussed Ms. Westbrook's "Washington-based family" and Washington "connections" and "activities." Dkt. 27 at 10:7-8, 13:11. But if purposeful direction is not established by the plaintiff's residence in the forum at the time of the alleged tort, certainly it is not established by the "discussion" of the much more attenuated fact that the plaintiff had "connections" to and unrelated "activities" in the forum. Indeed, Defendants discussed Plaintiffs' family connections to and activities in a number of states: North Carolina, South Carolina, Nevada, California, Hawaii, and Washington.

---

[6] *See Burdick v. Superior Court*, 233 Cal. App.4th 8, 25 (2015) (no personal jurisdiction with respect to claims arising from allegedly defamatory Facebook postings, because the postings were targeted at a national audience and there was no evidence of express aiming at California, rather than aiming at the plaintiff personally); *DFSB Kollective Co. Ltd. v. Bourne*, 897 F. Supp. 2d 871, 881 (N.D. Cal. 2012) ("If the defendant merely operates a website [or other electronic medium] ... that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution."); *Smart Energy Today, Inc. v. Hoeft*, 2016 WL 8200432 (C.D. Cal. June 20, 2016) ("The comments posted on AngiesList.com and Yelp.com are available to anyone in the United States with Internet access, but there is no allegation that Defendants encouraged California residents to access the sites or that they targeted California residents in any way.").

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS - 8

GORDON TILDEN THOMAS CORDELL | 600 University Street Suite 2915 Seattle, WA 98101 206.467.6477

### 2. Plaintiffs have knowingly misrepresented facts regarding their move from Los Angeles to Washington.

In their Complaint, Plaintiffs attempted to establish personal jurisdiction solely by alleging that they "moved to the State of Washington in 2018." Dkt. 1, ¶ 36. Defendants challenged this assertion in their Motion to Dismiss, demonstrating that Plaintiffs' own social media postings show they continued to live in Los Angeles at least through the end of 2019—a full year after they claim to have moved to Washington. Dkt. 17 at 14-17. In their Response, Plaintiffs again insist that they "moved back to Washington from California in late 2018," and purport to prove this by citing to the declarations of Tati and James Westbrook. Dkt. 27 at 5:2 (citing Dkt. 27-1 at ¶ 7 and Dkt. 27-2 at ¶ 3). This assertion is demonstrably and knowingly false.

In early September 2019, James Westbrook filed a motion to vacate a default judgment in a fraud lawsuit brought against him in Los Angeles County Superior Court, in a matter entitled *Hawkes v. Westbrook* (Los Angeles County Superior Court Case No. BC610791). *See* Supplemental Request for Judicial Notice, Ex. A. That motion was filed by the same Los Angeles attorneys who represent Plaintiffs in this case (admitted here *pro hac vice*). *Id.* It was premised on Mr. Westbrook's assertion that the *Hawkes* lawsuit and related papers were served on him at a Hollywood, California address that he had moved away from at the time of the service. *Id.* To establish that defense, Mr. Westbrook represented, in the motion and his sworn declaration, that in 2016 he moved to a residence in Sherman Oaks, California, *and* that he *"currently still reside[s]"* at that residence as of the date of the filing. *Id*. at 8:24-25; 19 ¶ 11 (emphasis added). Of course, Mr. Westbrook cannot have "continued to reside" in Sherman Oaks, California as of early September, 2019, if he had "moved to Washington" in late 2018. Either he deliberately misrepresented facts to the Los Angeles court in September 2019, or he is deliberately misrepresenting facts to this Court now.

The evidence overwhelmingly supports the latter conclusion. First, while they unequivocally *assert* in their Response Brief that they moved to Washington in late 2018, the

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS - 9

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

sworn declaration testimony that purports to prove that assertion merely states, evasively, that they "started to move to Washington in late October 2018." Dkt. 27-1 at ¶ 7; 27-2 at ¶ 3.[7] Second, the Westbrooks take pains to point out they are *currently* Washington residents and *currently* have bank accounts here, without stating when those events took place. Dkt 27-1 at ¶ 2; Dkt. 27-2 at ¶ 2. Third, the Westbrooks state, in their brief, that they "*paid taxes in Washington* for the 2019 tax year and will pay taxes in Washington for the 2020 tax year." Dkt. 27 at 5:6-7 (emphasis added). However, in their declarations, they attest only that they "*file* [their] personal *federal* income taxes in the State of Washington." Dkt. 27-1 at ¶ 8, Dkt. 27-2 at ¶ 4 (emphasis added). It is not clear what it means to "file" one's federal income taxes "in" a certain state.[8]

Fourth, in their Opening Brief Defendants pointed to numerous social media posts from Ms. Westbrook confirming that she did not "move to Washington" from Los Angeles until, at the earliest, late 2019. *See* Dkt. 17 at 14-17. Plaintiffs respond by arguing that this evidence is irrelevant and inadmissible because Defendants lack "personal knowledge" regarding Ms. Westbrook's physical location at the moments when she made those postings. Dkt. 27 at 5:17-6:2; 11:6-8. This is nonsensical. It is the *content* of these posts that have evidentiary value, as party admissions from sources Plaintiffs themselves confirm are their own. Fifth, Mr. Westbrook declares: "During the time that my wife and I owned that [Sherman Oaks, California] home, we no longer lived in Los Angeles, nor did we even spend a single night in said house." Dkt. 27-2 at ¶ 19. This appears to be another attempt to mislead. The Westbrooks did not "own" the Sherman Oaks house until May of 2020. Prior to that, they rented it, with an option to purchase. *See* Dkt. 27-2 at ¶ 19. As such, even if it were true that they did not live in Los Angeles or stay in their

---

[7] The Westbrooks are playing this same game of misrepresentation in support of a motion they filed in another fraud lawsuit currently pending against them in Los Angeles. There, in a December 21, 2020 filing, they unequivocally assert in their unsworn brief that they have "lived in Washington since December 2018." Supp. RJN, Ex. B at 29:4-13. But the only support they cite for that assertion is their sworn declarations, that state, in language that is almost comically evasive, that they "*made the decision to become a resident* of the State of Washington in December 2018." *Id.* at 39, ¶ 2; 44, ¶ 2 (emphasis added).

[8] It is telling that the Westbrooks are silent as to whether they paid California state income taxes in 2019.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO
DISMISS - 10

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

Sherman Oaks house during the time they "owned" it, that certainly does not support their contention that they moved to Washington in 2018. Finally, the fact that the Westbrooks signed a lease in late 2018 for a condominium in Bellevue—which they have used as the *corporate* address for several entities—does not overcome the sworn testimony regarding California residency as of late 2019. And the fact that Ms. Westbrook posted a photograph of herself in the Bellevue condominium in February 2019 is not evidence that this was her residence at that time.

**B.     The Court should grant the remainder of Defendants' Motion to Dismiss, if it does not dismiss the entire action for lack of personal jurisdiction.**

### 1.     DOE Defendants defeat diversity.

The Ninth Circuit and district courts in this district have held that DOE defendants defeat diversity, at least where an action is filed directly in federal court. *Garter-Bare Co. v. Munsingwear, Inc.*, 650 F.2d 975, 981 (9th Cir. 1980); *Fineman v. Lutz-Laidlaw Partnership*, 2020 WL 1905783 at *2 (S.D. Cal. April 17, 2020); *Joseph v. Joseph*, 2019 WL 1771683 at *2 (C.D. Cal. Feb. 21, 2019). Plaintiffs provide no reason for this Court to rule otherwise.

### 2.     Plaintiffs fail to plead Intentional Infliction of Emotional Distress.

Plaintiffs cite a Washington case for the proposition that "Washington courts focus more on the outrageousness of the conduct rather than the specific symptoms of emotional distress alleged." But the case they cite says nothing of the sort. *See* Dkt. 27 at 18:1-3 (citing *Spicer v. Patnode*, 9 Wn. App.2d 283, 297-98 (2019)).

### 3.     Plaintiffs failed to plead Negligent Infliction of Emotional Distress.

Defendants pointed out in their Motion that Plaintiffs failed to plead that they suffered a medically diagnosable mental or emotional disorder, such as "neuroses, psychoses, chronic depression, phobia, post-traumatic stress disorder, or any other disabling mental condition." *See Hegel v. McMahon*, 136 Wn.2d 132, 135 (1998). In response, Plaintiffs rely solely on a citation to the *dissenting* opinion in *Snyder v. Medical Service Corp. of Eastern Washington*, 145 Wn.2d 233, 254 (2001). Dkt. 27 at Plaintiffs fail to identify the cited passage as coming from a dissent.

### 4. Plaintiffs fail to plead the public interest element of a CPA claim.

Defendants argued that the Complaint fails adequately to allege that Defendants' alleged defamatory publications "are injurious to the public." *See Shugart v. GYPSY Official No. 251715*, 2015 WL 1965375 at *2 (W.D. Wash. May 1, 2015). Plaintiffs respond that Defendants have a YouTube channel that covers celebrity gossip. That does nothing to cure their failure to allege facts to support a plausible inference that this is anything more than a *private* dispute. If the mere speculation that a defendant *might* direct wrongdoing at other persons were sufficient to state a CPA claim, *every* alleged tort would become a plausibly-alleged CPA violation.

### 5. Plaintiffs' RCW 10.14.020 claim should be dismissed.

Defendants argued that Plaintiffs may not bring a claim in federal court under the criminal procedure statute RCW 10.14.020. Op. Br. at 22-24; *Barberio v. City of Burien*, 2006 WL 2237704 (W.D. Wash. August 3, 2006); *Peace v. Kerlikowske*, 2005 WL 8165815 at *6 (W.D. Wash. April 12, 2005). Plaintiffs cite an order in which Judge Martinez allowed such a claim to be brought. *Ferguson v. Waid*, 2018 WL 5734662 at *1 (W.D. Wash. Nov. 2, 2018). Defendants simply believe *Ferguson* was wrongly decided. Further, Plaintiffs fail to justify their continued (and telling) failure to fulfill the explicit statutory requirement that their claim "shall be accompanied by an affidavit made under oath stating the specific facts and circumstances from which relief is sought." RCW 10.14.040. Plaintiffs strangely insist they are not required to file an affidavit, because of a provision that allows for an *ex parte* application to be granted upon "the filing of an affidavit." Resp. at 20:1 (citing RCW 10.14.080). Finally, Plaintiffs cite no authority for the proposition that internet publications *about* a person, without more, constitute a "knowing and willful course of conduct directed *at* a specific person . . ." RCW 10.14.020(2) (emphasis added). In response Plaintiffs rely on *Ferguson v. Waid*, 2018 WL 2933400 at *2–*3 (W.D. Wash. June 12, 2018). But there the defendant's conduct included filing multiple meritless lawsuits against the plaintiffs. The filing of abusive frivolous lawsuits may be conduct directed "at" a plaintiff; posting allegedly defamatory stories on the internet *about* a plaintiff, without more, is not.

DATED this 6th day of January, 2021.

**GORDON TILDEN THOMAS & CORDELL LLP**
Attorneys for Defendants Katherine Manske Paulson and Without A Crystal Ball, LLC

By   s/ *Michael P. Brown*
Michael P. Brown, WSBA #45618
600 University Street, Suite 2915
Seattle, Washington 98101
206.467.6477
mbrown@gordontilden.com