1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TATIANA WESTBROOK, an individual;
JAMES WESTBROOK, an individual; HALO
BEAUTY PARTNERS, LLC, a Nevada Limited
Liability Company,

                      Plaintiffs,

     v.

KATIE JOY PAULSON, an individual;
WITHOUT A CRYSTAL BALL, LLC, a
Minnesota Limited Liability Company; and
DOES 1 through 100, inclusive,

                      Defendants.

NO. 2:20-cv-01606-BJR

**DECLARATION OF ELANA R. LEVINE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

**DECLARATION OF
ELANA R. LEVINE -1**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

I, ELANA R. LEVINE, hereby state as follows:

1.      I am an attorney admitted *pro hac vice* to appear before the U.S. District Court for the Western District of Washington in the above-captioned matter, and am Senior Counsel of Jacobson, Russell, Saltz, Nassim & de la Torre, LLP, counsel for Plaintiffs Tatiana Westbrook, James Westbrook, and Halo Beauty Partners, LLC in this matter. I am over the age of eighteen and am competent to testify to the facts stated herein.

2.      From the beginning of my interactions with Mr. Brown, he has been unnecessarily confrontational. Because of Mr. Brown's false accusations and misstatements since the outset of this case, it is now official policy in our office that there should be at least two attorneys on all calls with potential witnesses and conference calls with Defense counsel in this case. This, unfortunately, has caused Plaintiffs additional expense.

3.      As stated in my declaration filed on January 27, 2021,[1] in advance of the Status Conference, Mr. Brown submitted a declaration containing several incorrect and/or misleading statements, when, upon close examination, do no match up to the record in this case. These discrepancies have also led to an increase in time and expense for Plaintiffs to address.

4.      No documents have been filed by Plaintiffs' Counsel for an improper purpose. Multiple attorneys have been involved in the drafting and filing of pleadings.

A.   **Plaintiffs' Counsels' Interactions With Ms. Barnhart Did Not Overlap In Time With Mr. Brown's Communications With Ms. Barnhart**

5.      On January 12, 2021,[2] Ms. Barnhart made contact with Mr. Saltz, a partner at my firm. Ms. Barnhart is a resident of Washington, whose testimony is was submitted to establish not only Defendants' minimum contacts in the State of Washington through income derived

---

[1] Dkt. 46-2, ¶ 13.

[2] I did not communicate with Ms. Barnhart in any fashion, via telephone or otherwise, prior to January 12, 2021.

**DECLARATION OF
ELANA R. LEVINE -2**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

from Washington residents, but also to show a purported agency relationship between Defendants and a Washington resident. Plaintiffs did not submit Ms. Barnhart's testimony for an improper purpose, but rather to establish that jurisdiction is appropriate and to refute Defendant Paulson's testimony that she has no "subscribers in Washington… [nor] derives any income from the State of Washington",[3] and to refute Ms. Paulson's subsequent testimony that she had only been "in contact over social media with Lori Ann Barnhart on a few occasions."[4] [5]

6.     Mr. Saltz connected me onto the call on January 12, 2021 so that we could interview Ms. Barnhart together. We spoke to Ms. Barnhart on a series of phone calls on January 12, 2021 that, in total, lasted approximately 11 hours. The interview process was so lengthy because we did not rush Ms. Barnhart during our interview, but rather gave her time and respect to tell her story. The length of the interview process also gave us time to investigate and corroborate Ms. Barnhart's statements in real time.

7.     During the January 12, 2021 telephone calls, Ms. Barnhart forwarded numerous emails to both Mr. Saltz and myself containing communications between Ms. Barnhart and Mr. Brown.[6] I understand based on our telephonic conversations on January 12, 2021 that Ms. Barnhart's emails had potentially been hacked and/or deleted prior to our call. Mr. Saltz and I reviewed and discussed the emails that Ms. Barnhart sent to us, some of which are discussed in Ms. Barnhart's declaration.[7] Upon review of said emails, we immediately stopped our interview

---

[3] See Dkt. 19, ¶ 4.

[4] See Dkt. 34, ¶ 6.

[5] As stated in Ms. Barnhart's declaration, she was not only a paying member of Defendants' YouTube channel for several months, but the two women had communicated hundreds of times for the better part of 2020. Dkt. 38-1, ¶ 6.

[6] I understand now that we did not receive all of the emails between Ms. Barnhart and Mr. Brown. I have reviewed the emails contained in Dkt. 43-1, Exh. B and there are emails between Ms. Barnhart and Mr. Brown contained therein that I have not previously seen prior to Defendants' filing of said document.

[7] Additionally, Mr. Brown omitted some communications from his filings. True and correct copies of  missing emails are attached hereto as Exhibit "1."

**DECLARATION OF
ELANA R. LEVINE -3**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

with Ms. Barnhart and explained that we were concerned that the contents of the emails established that an attorney-client relationship had likely been formed between Ms. Barnhart and Mr. Brown, or at the very least, a prospective attorney-client relationship had been formed. It was at this point that Ms. Barnhart told Mr. Saltz and myself that she had thought that Mr. Brown was acting as her attorney because: she kept asking him for legal advice and he kept advising her;[8] he kept saying that he wanted to represent her in responding to a subpoena;[9] and said he wanted to help her make a record of complaints against Mr. Saltz.[10] Ms. Barnhart mentioned to Mr. Brown that she wanted to possibly consult with legal aid,[11] Mr. Brown dissuaded her, telling her that he would represent her at no cost.[12]

8.      Both Mr. Saltz and I asked whether Ms. Barnhart considered Mr. Brown to still be her attorney. Ms. Barnhart indicated that she had terminated her relationship with Mr. Brown,[13] called him a "slime ball,"[14] told Mr. Brown that she was going to call Mr. Saltz,[15] and cut off

---

[8] See Dkt. 43-1 pgs. 30 of 221 ("is there anything I can do, or should I try to ignore it"), 31 of 221 (legal advice), 39 of 221 ("Yes I would like to see what can be done"), 40 of 221 (legal advice), 43 of 221 (responding to missing email asking for legal advice), 48 of 221 (asking for legal advice), 49 of 221 (legal advice), 74 of 221 (legal strategy), 126 of 221 (legal strategy), 130 of 221 ("that would delay everything and the judge might just say you don't have to respond."), 167 of 221 (legal advice), 168 of 221 (legal advice), 176 of 221 (legal advice), 182 of 221 ("you have done nothing illegal…..I recommend that you …"), 191 of 221 (legal advice), 195 of 221 (legal advice), and 205 (legal advice and strategy).

[9] See Dkt. 43-1 pgs. 45 of 221 ("Do you have the ability to pay for your own lawyer if they do issue a subpoena?"), 159 of 221 ("I can help with that."), 167 of 221, 168 of 221, 182 of 221 ("accept service if they come to your door, and then we can take it from there."), 195 of 221 ("You don't need to spend money or hire a lawyer to respond to the subpoena"), and 169 ("I can give you some assistance with respect to responding to the subpoena.").

[10] See Dkt. 43-1 pgs. 31 of 221, 182 of 221 ("I want the court to know what he's doing to harass you."), 205 of 221.

[11] See Dkt. 43-1 p. 171 of 221 ("Snohomish county legal services maybe they can help me.").

[12] See Dkt. 43-1 pgs. 45 of 221 ("Do you have the ability to pay for your own lawyer if they do issue a subpoena?"), 173 of 221 ("What help do you think you'd need from legal services?"), 147 ("I can help you with the response, for no charge."), and 195 of 221 ("You don't need to spend money or hire a lawyer to respond to the subpoena").

[13] See Dkt. 52, p. 38 of 39 ("Good luck with your case.").

[14] See Dkt. 43-1 p. 189 of 221 ("Unfortunately I see who the slime ball is now.").

[15] See Dkt. 43-1 p. 188 of 221 ("I will call him tomorrow.").

**DECLARATION OF**
**ELANA R. LEVINE -4**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

communications with Mr. Brown.[16] Ms. Barnhart also told us that she informed Mr. Brown that she would not be signing any of his draft documents and made up an excuse that she didn't know how to download them on her phone, hoping that he would take the "hint"[17] and leave her alone.[18]

9.     We then double-checked the emails Ms. Barnhart sent us and confirmed what she had told us, and that her communications with Mr. Brown appeared to have been cut off on January 11, 2021.[19] Based on our review and conversation with Ms. Barnhart, Mr. Saltz and I were satisfied that the emails that Ms. Barnhart provided us corroborated what she said regarding the termination of any potential attorney-client relationship that existed between Ms. Barnhart and Mr. Brown. As such, we proceeded with our interview of Ms. Barnhart and our review of her documentary evidence.

10.     At a certain point in our questioning of Ms. Barnhart on January 12, she informed us that she takes medication for her personal health issues. She later informed us that she had just taken the medicine and that the side effects will eventually make her "foggy." Based on this information, Mr. Saltz and I told her that we would like to end the interview for the day and pick up again the following day when Ms. Barnhart would not be suffering any effects from the medication.

---

[16] See Dkt. 63 p. 4.

[17] The situation is akin to someone turning down a suitor with the polite excuse, "Sorry, I'm washing my hair that night."

[18] See Dkt 52, Ex. C, p. 37 of 39 ("I don't know how to download everything on my phone so it won't be done.").

[19] Ms. Barnhart cut off any and all communications with Mr. Brown on January 11, 2021 concerning any potential representation in this matter before our initial communication with her on January 12, 2021. This timeline is confirmed in Defendants' Motion to Qualify Counsel to Continue to Represent Defendants, which states at page 4, lines 1-8: "... even if the emails could reasonably be construed as an offer of representation, Ms. Barnhart's own testimony establishes that she rejected that putative offer; indeed she testified that she was 'suspicious' and 'not comfortable' with [Mr. Brown] as her attorney, and she therefore 'cut off all communications with' [Mr. Brown], and proceeded to speak with Plaintiffs' counsel *the following day*." Dkt. 63, p. 4. (Emphasis added.).

**DECLARATION OF
ELANA R. LEVINE -5**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

11.     I took notes during the phone calls on January 12, 2021 and drafted Ms. Barnhart's declaration based on our telephonic conversations and the voluminous documents provided by Ms. Barnhart. After I drafted Ms. Barnhart's declaration, I sent it to Mr. Saltz, who edited the document and added screenshots of the evidence provided by Ms. Barnhart during the phone calls to prove the veracity of Ms. Barnhart's statements.

12.     On January 13, 2021, Mr. Saltz and I continued and completed the interview process with Ms. Barnhart. I subsequently transmitted a draft declaration to Ms. Barnhart via email. Mr. Saltz and I then called Ms. Barnhart again to go over the draft declaration with her. Because Ms. Barnhart had disclosed to us that she has personal health issues that cause her to have trouble focusing, Mr. Saltz took his time on the call to verbally recite the entire declaration aloud, while Ms. Barnhart physically reviewed it on her end. I followed along with the reading and informed Ms. Barnhart that if Mr. Saltz was reading too quickly at any time, that she should feel free to interrupt him and ask him to slow down. We proceeded to go over the declaration word for word, line by line, sentence by sentence, to ensure that it was accurate. I did not allow any paragraphs to go by in the declaration without stopping and checking with Ms. Barnhart to ask if the wording was accurate and if she had any edits. Ms. Barnhart did have some changes to the document, which we made. We then resent her the corrected declaration, and Ms. Barnhart subsequently executed the declaration and sent it back. I filed the document with the Court later that day.

13.     Mr. Saltz and I spent approximately five to six hours on the phone with Ms. Barnhart on January 13, 2021. There were some technical issues with Ms. Barnhart's wifi signal that day, so there were multiple telephone conversations on that date. In total, the interview process with Ms. Barnhart was approximately 16 hours.

14.     From the time of our initial phone call with Ms. Barnhart, she emphasized that time was of the essence. Specifically, Ms. Barnhart had stated that the entire purpose as to why

**DECLARATION OF
ELANA R. LEVINE -6**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

she reached out to Mr. Brown in the first instance was because she wanted to ensure that the Court record was corrected as to her identity and the other woman bearing the same name as her, which Mr. Brown failed to do.[20] At no time did I or Mr. Saltz pressure Ms. Barnhart to execute her declaration or rush her to sign her declaration. On the contrary, we informed her that she is under no obligation to execute a declaration with our office if she did not want to execute it. We also informed Ms. Barnhart that we are not her attorneys, and that we only represent the Plaintiffs in this case. As with any other witness, I told Ms. Barnhart that my only request of her was that she be honest as she is signing a document under penalty of perjury. We also informed her that we cannot advise her on any legal issues and that she is free to obtain independent counsel at any time, including before signing her declaration.

15.    Ms. Barnhart indicated that she understood that we are not her attorneys and that she wanted to proceed, as it was her paramount desire to clear up the mix-up with the other woman bearing her same name as soon as possible.[21] Once again, Mr. Brown has caused Plaintiffs to bear unnecessary additional expense in this matter. Had he simply followed Ms. Barnhart's stated desire to contact Plaintiffs' counsel to clear up the mix-up with the two identical names as soon as possible, Ms. Barnhart would more than likely not have terminated her relationship with Defendants' Counsel. Yet, instead of doing so, Mr. Brown used his communications with Ms. Barnhart as an opportunity to usurp the subpoena process, thus delaying discovery that Ms. Barnhart was willing to voluntarily turn over without Court involvement,[22] and to pocket the error made in the Kim Fulmer declaration[23] to use later as a

---

[20] See Dkt. 43-1 p. 75 of 221 ("I contacted you because of the doxing of the wrong Lori").

[21] Decl. Barnhart, ¶ 19, Dkt. 38-1.

[22] Decl. Barnhart, ¶ 23, Dkt. 38-1.

[23] Decl. Barnhart, ¶ 13, Dkt. 38-1.

**DECLARATION OF
ELANA R. LEVINE -7**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

weapon against Plaintiffs' counsel as a surprise on a later date. The record filed by Mr. Brown confirms Ms. Barnhart had made numerous requests of Mr. Brown to ensure Plaintiffs' Counsel knew they needed to correct the record so that the woman bearing Ms. Barnhart's same name would not be at risk of potential harassment,[24] and made numerous statements to Mr. Brown of Ms. Barnhart's desire to voluntarily provide Plaintiffs' counsel with full access to her social media accounts.[25] However, after asking Mr. Brown for nearly three weeks to make sure that the record was corrected with regard to the other woman bearing her same name, Ms. Barnhart became upset that Mr. Brown had not made *any* contact with Plaintiffs' counsel to inform them of the issue and that he still did not know if Plaintiffs' counsel was aware of this issue.[26] Further, after stating several times to Mr. Brown that she wanted to call Mr. Saltz and voluntarily provide him with access to all her social media and email accounts because she had nothing to hide and wanted to be done with this case, Ms. Barnhart had become upset that Mr. Brown would talk her out of doing so.[27]

16.    To date, Plaintiffs' Counsel has not been contacted by any member of the public agency in question or any other person named Lori Ann Barnhart in any manner whatsoever.

---

[24] See Dkt. 43-1, pgs. 33 of 221 ("I hope that other Lori isn't being harassed."); 47 of 221, ("Look what they have done to me and the other Lori"), 53 of 221; 75 of 221 ("I contacted you because of the doxing of the wrong Lori"); 88 of 221; 95 of 221; 146 of 221 ("Do they know I am not the other Lori yet?"); 160 of 221 ("I think they still believe that I am the other Lori."); 165 of 221 ("Do they know I am not the other Lori?"); 166 of 221,; 177 of 221 ("They can show up at Lori's house or work, harass her and her family now too"); and 186 of 221 ("Can you tell me what is going on with the other Lori?").

[25] See Dkt. 43-1 pgs. 44 of 221 ("Maybe it would just be easier if I went and met with him myself... I have nothing to hide."), 47 of 221 ("For all I care they can look at all my internet activities."), 171 of 221 ("I guess I can just call [Mr. Saltz] and authorize YouTube and twitter to give him all of it."), and 188 of 221 ("I will call [Mr. Saltz] tomorrow.").

[26] See Dkt. 43-1, p. 166 of 221 ("I don't know. If they knew it would make it even more remarkable that they haven't corrected the record.").

[27] See Dkt. 43-1 pgs. 45 of 221 ("I understand that impulse but you need to understand the type of person he is."); 193 of 221 ("Can you please talk with me before you do anything?"); and 200 of 221 ("I understand this is very stressful. You should at least speak with me about it."); also see Dkt. 52  p. 33 of 39 ("Someone is talking to me on a sock account telling me not to trust Saltzy.")

**DECLARATION OF**
**ELANA R. LEVINE** -8
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

### B. Mr. Brown Concealed His Communications With Ms. Barnhart

17.     I have reviewed numerous emails between Mr. Brown and Ms. Barnhart, dating to as early as December 24, 2020. Mr. Brown was in contact with Ms. Barnhart when Plaintiffs' Counsel was seeking Court intervention to issue a subpoena for Ms. Barnhart's newly-deleted social media accounts. Mr. Brown failed to disclose that he intended to represent Ms. Barnhart even for a limited purpose, let alone that he was in contact with her.

18.     Ms. Barnhart's competence and credibility was of no concern to Mr. Brown as demonstrated by his attempts to procure a declaration from her.[28] It was only after Plaintiffs' Counsel succeeded in obtaining a declaration from Ms. Barnhart that Mr. Brown attacked her competence and credibility.[29]

19.     Mr. Brown hid his communications with Ms. Barnhart from Plaintiffs' Counsel, including myself, stymying the subpoena process, and offered to object to the subpoena on Ms. Barnhart's behalf to delay discovery. Specifically, on December 30, 2020, at 5:37 AM, Ms. Barnhart informed Mr. Brown that her "twitter account is gone."[30] Later that same day, I engaged in a meet and confer conference with Mr. Brown, along with Mr. Saltz and Ms. Kaplan, regarding Ms. Barnhart's missing Twitter account. At no time during the call did Mr. Brown inform us that he was in contact with Ms. Barnhart. This omission is confirmed by Mr. Brown in

---

[28] See Dkt. 43-1, p. 106 of 221 ("Are you able to sign something this evening and scan it back to me?"), 111 of 221 ("Will you be able to review a final version in an hour or so?"), 193 of 221 (Can you please talk with me before you do anything? I think there has been some misunderstanding and I'd like to have a chance to clear it up. We will be filing an objection today to Saltz's latest 'declaration' and I'd like to include a statement from you if you are on board with that."), 195 of 221 ("I'd like to stand up for you by filing your declaration if you'd let me. It costs you nothing."), 197 of 221 ("Can we please discuss this on the phone? I really think you will feel better if we do."), 200 of 221 ("You should at least speak with me about it.")

[29] Mr. Brown also sent Ms. Barnhart an email dated January 8, 2021 stating, "You're willing to sign a sworn declaration saying so. That's generally a solid indication someone is telling the truth." Dkt. 43-1, p. 166 of 221.

[30] See missing emails, Exhibit "1." Attached to Exhibit "1" are portions of an email trail between Ms. Barnhart and Mr. Brown commencing on December 30, 2020, portions of which have been omitted from Mr. Brown's "Compendium" of emails between himself and Ms. Barnhart.

DECLARATION OF
ELANA R. LEVINE -9
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

said email trail wherein he indicates, on December 30, 2020, at 5:55 PM: "I spoke with Saltz today. They are planning to subpoena your Twitter account because they see that you closed your account and they think there might be evidence there about your connection to Katie. I did not disclose that you and I are in touch. Saltz even complained to me that you 'threatened' him via DM."[31] In response, on December 30, 2020, at 6:18 PM, Ms. Barnhart asked for legal advice from Mr. Brown and wrote, "Figures. What are your thoughts?"[32]

20.     Based upon the aforementioned emails, I believe that Mr. Brown did not meet and confer in good faith regarding the Parties' Joint Status Report and Discovery Plan, as Mr. Brown withheld material information from Plaintiffs' Counsel. Additionally, this caused additional expense to Plaintiffs as we negotiated the terms of the Parties' Joint Status Report and Discovery Plan, which was filed on January 4, 2021, and a subsequently-filed stipulation.[33] In the Joint Status Report and Discovery Plan, the Parties agreed to a stay on discovery pending the Court's decision on Defendants' Motion to Dismiss, with a specific exception for "Plaintiffs to issue subpoenas for Lori Ann Barnhart's social media and internet content as well as her communications with Defendants that they believe may be lost in the absence of such subpoenas."[34] On January 5, 2021, Mr. Brown filed a "Stipulated Order Staying Discovery Pending Resolution Of Defendants' Personal Jurisdiction Challenge," which included this exemption.[35] Mr. Brown also did not meet and confer regarding the Stipulated Order Staying

---

[31] *Id.*

[32] This email at 6:18 pm was not included with Mr. Brown's declaration.

[33] See Dkt. 31, 32.

[34] *Id.* at p. 1-2.

[35] See Dkt 32.

**DECLARATION OF
ELANA R. LEVINE -10**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

Discovery in good faith, as he was withholding material information regarding his communications with the subject of the discovery at-issue: Ms. Barnhart.

### C. **The Statements Made In Ms. Barnhart's Declaration Are Either Undisputed or Supported by Documentary Evidence**

21.     The statements contained in Ms. Barnhart's declaration are supported by documentary evidence and/or are undisputed in Defendants' Motion. Attached hereto as Exhibit "2" is a table of excerpts from Ms. Barnhart's declaration and supporting evidence.

### D. **The Unsigned Draft Documents are Grossly Inaccurate**

22.     The labelling of a "first"[36] and "second" declaration in Defendant's Motion is a misnomer. Attached to the declaration of Mr. Brown as Exhibit "E"[37] is a chart of purported differences between the *three* draft documents transmitted to Ms. Barnhart by Mr. Brown (the "Unsigned Barnhart Declaration") and related correspondence juxtaposed against Mr. Brown's impressions of Ms. Barnhart's *only* sworn declaration. Mr. Brown's comparisons greatly mischaracterize and/or misrepresent the documents. The following is a non-exhaustive list of examples of such mischaracterizations and/or misrepresentations:

      a. In ¶ 1 of Exhibit "E," Mr. Brown's states that nothing in the first draft document is inconsistent with Ms. Barnhart's 1,500-word personal statement.[38] Paragraph 3 of the draft document discusses Ms. Barnhart's prior criminal case and falsely claims that: "it did not involve harm or a threat of harm on any person."[39] Ms.

---

[36] On January 6, 2021, Mr. Brown transmitted three (3) versions of a draft declaration for Ms. Barnhart's review. See Dkt. 43-1, pp. 83-87; 98-103; 117-123.

[37] Dkt. 60. See also Dkt. 43-1, pp. 83-87; 98-103; 117-123.On January 6, 2021, Mr. Brown transmitted three (3) versions of a draft declaration for Ms. Barnhart's review.

[38] Dkt. 43-1, p. 56-62 of 221.

[39] Dkt 43-1, p. 85 of 221, 101 of 221, 120 of 221.

**DECLARATION OF**
**ELANA R. LEVINE -11**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

Barnhart's 1,500-word statement makes no mention of her criminal case, and does not attempt to deny the public record. Likewise, paragraph 6 of the draft document states that Ms. Barnhart informed Mr. Saltz "that he had disclosed the phone number and address of the wrong person."[40] The 1,500-word statement does not say anything about Ms. Barnhart sending Mr. Saltz a message containing such detail. Rather, the 1,500-word statement confirms that Ms. Barnhart sent Mr. Saltz a more cryptic message that "he doxed the wrong person."[41]

b.   In ¶ 2 of Exhibit "E," Mr. Brown's statement that Ms. Barnhart "never" objected to "anything" and was eager to sign a document with his office in its final form is belied by the fact that Ms. Barnhart ultimately did not sign the draft document, and ultimately cut off communications with Mr. Brown on January 11, 2021.[42]

c.   Nothing Mr. Brown states with regard to ¶ 3 has any effect on Ms. Barnhart's statement that she did not *tell* Mr. Brown that Mr. Saltz threatened her. In ¶ 3 of Exhibit "E," the statement "[m]ore threats directed at me!" has the wrong date, is taken out of context, and is mischaracterized. This is a response to a direct message after January 1, 2021 from a friend of Ms. Barnhart who indicated, "He tries to make one think he's a friend."[43] Further, the statement was not made to Mr. Brown. Ms. Barnhart confirmed during our January 12, 2021 call, after refreshing her recollection and reviewing these direct messages once again, that she was not actually threatened by Mr. Saltz. Additionally, January 1, 2021 is

---

[40] *Id.*

[41] Dkt. 43-1, p. 61 of 221.

[42] See Dkt. 63, p. 4; See Dkt. 43-1, p. 189 of 221.

[43] Dkt. 43-1, p. 153 of 221.

**DECLARATION OF**
**ELANA R. LEVINE -12**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

days after Mr. Brown informed Ms. Barnhart that a subpoena would be issued. Mr. Brown indicated on January 6, 2021 that Mr. Saltz threatened to add Ms. Barnhart to this lawsuit.[44] Prior to Mr. Brown's January 6, 2021 email with the false threat, the record is clear that Ms. Barnhart had *never* told Mr. Brown that Mr. Saltz threatened her. Rather, all other references to the word "threatened" that Mr. Brown claims in his declaration to exist[45] were contained in communications Ms. Barnhart wrote after January 6, 2021, and were then only repeated back to Mr. Brown what he falsely informed her on January 6, 2021.[46] Nowhere in the 1,500-word statement sent prior to January 6, 2021, did Ms. Barnhart state therein that Mr. Saltz threatened her.[47] The email from Ms. Barnhart that prompted Mr. Brown's response informed Mr. Brown that Mr. Saltz only stated that: "[Ms. Barnhart] was being added to the witness list or something."[48] Mr. Brown then mentioned the word "threatened" to Ms. Barnhart for the first time in response to Ms. Barnhart by stating: "Yeah he threatened to add you to the lawsuit." Mr. Brown also cites to page 146 in Dkt. 52, but there is no such page therein. There were no threats made by Mr. Saltz to Ms. Barnhart, subsequently Mr. Brown sent an email on January 11, 2021 stating: "It would be great if you would state that you took it as a threat and felt intimidated etc."[49]

---

[44] See, e.g., 43-1, p. 83 of 221, stating, "he threatened to add you to this lawsuit."

[45] Dkt. 43-1 ¶ 30(a)-(e).

[46] Mr. Brown claims that a direct message screenshot [Dkt. 43-1, p. 153 of 221] of Ms. Barnhart's private messages with a friend that uses the word "threats" is dated January 1, 2021, and shows Ms. Barnhart's declaration is inconsistent. Dkt. 43-1 ¶ 30(a). However, the date of said message is not January 1, 2021, and said message was not a communication with Mr. Brown, confirming that Ms. Barnhart's statements in her declaration remain accurate.

[47] Dkt. 43-1, pgs 56-62 of 221.

[48] Dkt. 43-1 p. 83 of 221 (emphasis added).

[49] Dkt. 43-1, p. 198 of 221 (emphasis added).

**DECLARATION OF**
**ELANA R. LEVINE -13**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

d.  In ¶ 4 of Exhibit E, Mr. Brown is asking the Court to discount a sworn declaration and instead rely upon unsigned draft documents prepared by his office.[50] These statements were made at a time in which Ms. Barnhart did not have access to her Twitter account to refresh her recollection. Additionally, Mr. Brown did not ask Ms. Barnhart to reinstate her Twitter account so that he could review it to verify the accuracy of these statements. In contrast, Mr. Saltz did have Ms. Barnhart reinstate her Twitter account and spent several hours with Ms. Barnhart reviewing several hundred interactions between Ms. Barnhart and Ms. Paulson. See Decl. Saltz, ¶ 33. In reviewing these interactions, Mr. Saltz noticed public tweets wherein Ms. Paulson had asked Ms. Barnhart to perform tasks on her behalf. *Id.* This caused Mr. Saltz to inquire further about Ms. Barnhart's interactions with Ms. Paulson, which sparked a specific set of memories regarding Ms. Paulson asking Ms. Barnhart to issue negative reports on the YouTube videos of some of Ms. Paulson's competitors. See Decl. Saltz, ¶¶ 43-44.

e.  In ¶ 5 of Exhibit E, Mr. Brown states that Ms. Barnhart's statement that Ms. Paulson knew that she lived in Washington is inconsistent with the statements in his various draft documents that Ms. Barnhart has no reason to believe Ms. Paulson knew she lived in Washington. Ms. Barnhart's 1,500-word statement told Mr. Brown: "I reached out to her [Ms. Paulson] around April and I told her **my life story**."[51] In addition, Ms. Barnhart informed Mr. Brown that she was Facebook friends with Ms. Paulson.[52] This is significant because, had Mr. Brown

---

[50] Dkt. 43-1, pp. 83-87, 98-103, 117-123.

[51] Dkt 43-1, p. 57 of 221.

[52] Dkt 43-1, p. 186 of 221.

**DECLARATION OF**
**ELANA R. LEVINE -14**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

performed his due diligence, he would have learned that Ms. Barnhart's Facebook account displayed her state of residence to be in Washington.[53]

f.  In ¶ 7 of Exhibit E, Mr. Brown matches up two consistent statements. Additionally, Mr. Brown did not have the benefit of the Twitter account when drafting the statements.

g.  In ¶ 8 of Exhibit E, Mr. Brown fails to account for the fact that during the interview of Ms. Barnhart, Mr. Saltz interviewed her about her 1,500-word statement and asked Ms. Barnhart by what method did she share with Ms. Paulson her "life story." Ms. Barnhart then remembered that she did it in a lengthy email to Ms. Paulson, to which Ms. Paulson also replied via email.

h.  In ¶ 9 of Exhibit E, Ms. Barnhart shared her intimate life details in one of the first emails to Mr. Brown, *not* at the end of their three-week relationship. During the telephonic conversation, Ms. Barnhart stated that she did not trust Mr. Brown because she expressly told him that it was incredibly important to her that the error in the Kim Fulmer declaration be corrected immediately. She stated that she expected Mr. Brown to contact Mr. Saltz at the earliest possible moment to advise him of the error so that Mr. Saltz would know to file something with the Court to correct it. Ms. Barnhart then said that her mistrust in Mr. Brown grew over the next three weeks wherein she would continuously prod Mr. Brown as to whether the issue had been addressed.[54] All trust broke down when it became apparent that Mr. Brown was not going to contact Plaintiffs' Counsel.

---

[53] Decl. Barnhart, Dkt. 38-1, ¶ 4.
[54] See Dkt. 43-1, pgs. 46 ("I contacted you because of the doxing of the wrong Lori"), 59, 66, 117 ("Do they know I am not the other Lori yet?"), 131 ("I think they still believe that I am the other Lori."), 136 ("Do they know I am not the other Lori?"), and 157 (Can you tell me what is going on with the other Lori?").

**DECLARATION OF
ELANA R. LEVINE -15**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

i.   In ¶ 10 of Exhibit E, Mr. Brown's statements are not inconsistent with the signed declaration. Mr. Brown's statement that Ms. Barnhart was "eager" to sign a document with his office in its final form is belied by the fact that Ms. Barnhart ultimately did not sign the draft document, and ultimately cut off communications with Mr. Brown on January 11, 2021. Mr. Brown obviously misread the situation.

j.   In ¶ 11 of Exhibit E, Ms. Barnhart's declaration is supported by her statements made to me and Mr. Saltz during a telephonic conversation on January 12, 2021. Mr. Brown's attempt to accuse Ms. Barnhart of lying is belied by numerous documents that prove otherwise.[55]

k.   In ¶ 12 of Exhibit E, Mr. Brown attempts to change the words of paragraph 28 of Ms. Barnhart's declaration and cites to a document that does not say what Mr. Brown states that it says.[56] As stated above, Mr. Brown's draft declarations are contradicted by the 1,500-word statement, and the cryptic message Ms. Barnhart sent to Mr. Saltz.

l.   In ¶ 13 of Exhibit E, Mr. Brown had evidence that the statement in his draft documents were incorrect. Ms. Barnhart only sent Mr. Saltz cryptic messages.[57]

**E.   Mr. Brown's Attempted to Procure False Testimony From Ms. Barnhart**

23.   On January 6, 2021, Mr. Brown transmitted three (3) versions of a draft declaration to Ms. Barnhart for her review, all of which had false statements contained therein, that are contradicted by the written record provided by Ms. Barnhart and/or the declaration of Kim Fulmer.

---

[55] See table of testimony, Exhibit "2."

[56] See Dkt 43-1, p. 124 of 221 (or page "95" as noted at the bottom of the page, as cited by Mr. Brown) states: "I don't have a printer can I use one of those signature apps?").

[57] See Decl. Saltz, ¶¶ 8-9.

**DECLARATION OF**
**ELANA R. LEVINE -16**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

24.     For instance, paragraphs 2 and 3 of the draft documents transmitted by Mr. Brown to Ms. Barnhart contain false statements regarding purported interactions between Mr. Saltz and Ms. Barnhart.[58] Specifically, the false statements are that the declaration of Ms. Fulmer was an effort to "follow through on a public threat he directed at me via Twitter in November 2020," and "Mr. Saltz responding by publicly threatening to make me a defendant in this case…" There was no such threat. Instead, as stated above, Ms. Barnhart told Mr. Brown that Mr. Saltz was "soliciting information on twitter,"[59] and that Mr. Saltz was going to add Ms. Barnhart to a "**witness list**."[60] The only threats were the fake threats invented by Mr. Brown on January 6, 2021 to scare Ms. Barnhart into falsely believing that Mr. Saltz was "threatening" to add Ms. Barnhart to this lawsuit.[61] All mentions of such "threats" by Ms. Barnhart to Mr. Brown, were after Mr. Brown's January 6, 2021 email, and were Ms. Barnhart repeating what she learned from Mr. Brown and not telling Mr. Brown any facts from her own personal experience.

25.     Paragraph 3 of the draft documents transmitted by Mr. Brown to Ms. Barnhart contain false statements regarding the nature of Ms. Barnhart's criminal offense, which is a matter of public record, and was equally available to Mr. Brown to confirm the contents of said record.  The draft documents state that Ms. Barnhart's criminal case did not "involve harm or a threat of harm on any person."[62] Additionally, Ms. Barnhart discussed her criminal matter with Mr. Brown, yet he misstated the nature of the criminal case in the draft documents.[63]

---

[58] See Dkt 43-1, p. 118-119. See also pp. 84-85, 99-100.

[59] See Dkt. 43-1, p. 4.

[60] Dkt. 43-1 p. 82 of 221 ("I was being added to the **witness list** or something")(Emphasis added.)

[61] See Dkt. 43-1 p. 83 of 221 ("he threatened to add you to this lawsuit.").

[62] See Dkt. 43-1, p. 85 of 221, 101 of 221, (also see paragraph 5 on p. 118-119.)

[63] Dkt. 43-1, p. 39 of 221.

**DECLARATION OF
ELANA R. LEVINE -17**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

26.     Paragraph 9 of the draft documents transmitted by Mr. Brown to Ms. Barnhart contains the following false statement, unsupported by evidence: "I informed Mr. Saltz shortly after the filing of the Fulmer declaration that he had 'doxed' (disclosed the phone number and email address of)"[64] the wrong person. As stated above, nowhere in the record does it indicate that Ms. Barnhart informed Mr. Saltz that he had disclosed the phone number and email address of the wrong person.

27.     Paragraph 11 of the draft documents transmitted by Mr. Brown to Ms. Barnhart contains the following false statement that is contradicted by the substantial written record: "My interactions with Ms. Paulson have been limited to: (1) a few brief online conversations unrelated to this matter; (2) the fact that I was a subscriber to her channel for a brief time in __ , 2020; and (3) the fact that last week I sent her a few 'chats' (after the filing of the Fulmer Declaration)… Ms. Paulson and I have never been friends and have had very little direct contact. I have not done anything to coordinate with her to 'hide evidence' or do anything unlawful, nor do I have any reason to believe she would want me to do so…I have no reason to believe Ms. Paulson knew what state I lived in[65] until very recently."[66]

28.     First, paragraph 11 of the draft documents are false in regard to the statement that Ms. Barnhart does not have any reason to believe Ms. Paulson knew that she lived in Washington. As stated above, Ms. Barnhart's 1,500-word statement told Mr. Brown: "I reached out to [Ms. Paulson] around April and I told her **my life story**."[67] (Emphasis added) In addition,

---

[64]See Dkt. 43-1, p. 119 of 221 (also see paragraph 6 on p. 86, paragraph 8 on page 102).

[65] Dkt. 43-1, pp. 56-60. One generally does not tell the intimate details of one's life story without sharing basic details such as where the person is from.

[66] Dkt 43-1, p. 102-103 of 221 (also see p. 121 of 221).

[67] Dkt 43-1, p. 57 of 221.

**DECLARATION OF**
**ELANA R. LEVINE -18**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

1  Ms. Barnhart informed Mr. Brown that she was Facebook friends with Ms. Paulson.[68] This is

2  significant because, had Mr. Brown performed his due diligence, he would have learned that Ms.

3  Barnhart's Facebook account displayed her state of residence to be in Washington.[69]

4      29.    Second, Mr. Brown's attempt to have Ms. Barnhart diminish her connection to

5  Ms. Paulson is an attempt to create a false narrative. Mr. Brown knew Ms. Barnhart had deleted

6  her Twitter account and had not asked her to reinstate it so that he could verify the documented

7  interactions between Ms. Barnhart and Ms. Paulson. Without actually reviewing Ms. Barnhart's

8  Twitter account containing hundreds of interactions between Ms. Barnhart and Ms. Paulson, Mr.

9  Brown asked Ms. Barnhart whether she would be "willing to file a statement that just says you're

10  not that Lori and that your contact with KJ was limited to a few chats?"[70]

11      30.    Mr. Brown did not attest that he actually went over the contents of the draft

12  document word by word, line by line, paragraph by paragraph as Plaintiffs' Counsel did.

13  Moreover, Ms. Barnhart never attested under penalty of perjury as to the contents of the draft

14  document. This is confirmed by the fact that she never executed the document.

15  **F.  The January 27, 2021 Conference Call**

16      31.    On or about January 27, 2021, I attended a telephonic conference call, requested

17  by Mr. Brown that lasted a total of 40 minutes, not one hour as stated in Mr. Brown's time

18  records. The conference call was supposed to be regarding the following four anticipated

19  motions to be brought by Mr. Brown:

20      a)  Motion for sanctions under § 1927 (the instant motion);

21      b)  Motion for Rule 11 sanctions;

22

23  ───────────────
   [68] Dkt 43-1, p. 186 of 221.

24  [69] Decl. Barnhart, Dkt. 38-1, ¶ 4.

25  [70] Dkt. 43-1, p. 55 of 221.

26  **DECLARATION OF**                    **CARROLL, BIDDLE, & BILANKO, PLLC**
   **ELANA R. LEVINE -19**                1000 2nd Avenue, Suite 3100
   (2:20-CV-01606-BJR)                    Seattle, WA  98104

c)  Motion to shorten time on the 21-day safe harbor period for the Rule 11 motion; and

d)  Motion to Qualify Mr. Brown to continue to represent Defendants.

32.     Mr. Brown's entire recantation of said discussions during the meet and confer telephone call is false. During our limited discussion about the instant motion for sanctions, Mr. Brown questioned various aspects of the Signed Barnhart Declaration.  Mr. Saltz told Mr. Brown during the call was that Ms. Barnhart takes medication on occasion for her personal health issues.  Mr. Saltz explained that the side effect of the medication makes Ms. Barnhart "foggy." Mr. Saltz then explained to Mr. Brown that Ms. Barnhart had advised us that after speaking for approximately 11 hours on January 12, she took her medication. Mr. Saltz told Mr. Brown that this caused us to adjourn our call on January 12, 2021 and pick back up the next day when Ms. Barnhart would be thinking more clearly.

33.     No one told Mr. Brown that Ms. Barnhart had told him a false story. Additionally, contrary to his statement in paragraph 5 of his declaration, no one told Mr. Brown that *we* rushed to complete the interview with Ms. Barnhart and obtain her signature. Instead, Mr. Saltz told Mr. Brown that Ms. Barnhart sought to correct the public record as quickly as possible because after three weeks of communications with Mr. Brown, he had not dealt with the issue.

34.     Mr. Saltz told Mr. Brown that he was more than willing to share the documents that our office reviewed in drafting the declaration. Mr. Brown did not follow up with Mr. Saltz's offer before filing his motion for sanctions.

35.     Although we had not finished substantively discussing the issues, after approximately 40 minutes, Mr. Brown indicated that his associate needed to depart the call, so the call was cut short. We did not complete the meet and confer process as to the other potential motions that Mr. Brown indicated that he wanted to bring. At the conclusion of the call, Mr. Brown did not attempt to reschedule before filing the instant motion.

**DECLARATION OF
ELANA R. LEVINE -20**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

36.     During the January 27, 2021 call, Mr. Brown asked about the "mass flagging" referenced in the Signed Barnhart Declaration. I informed Mr. Brown that there were videos made about Defendant instructing others to flag other YouTube channels, in violation of terms of service. Subsequent to the call, I sent Mr. Brown a link to one of these videos, which corroborated Ms. Barnhart's testimony on the matter, and Mr. Brown thanked me. However, Mr. Brown pressed forward with his Motion for Sanctions, ignoring the evidence that we provided to him during the call, insisting that the entire declaration of Ms. Barnhart is still false, and refusing to meet and confer with us to go over the documents that Plaintiffs had obtained from Ms. Barnhart in advance of the filing of his motion that confirm her truthful and corroborated statements contained therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SIGNED on March 3, 2021

/s/ Elana R. Levine
Elana R. Levine

**DECLARATION OF**
**ELANA R. LEVINE -21**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

# EXHIBIT "1"

---------- Forwarded message ----------
From: **B Lori** <|
Date: Tue, Jan 5, 2021 at 8:08 AM
Subject: Re:
To: Michael P. Brown <mbrown@gordontilden.com>


I can talk anytime


On Tue, Jan 5, 2021 at 7:55 AM Michael P. Brown <mbrown@gordontilden.com> wrote:

I'm waiting to hear back from the lawyer for the other Lori still.


Would you be willing to file a statement that just says you're not that Lori and that your contact with KJ was limited to a few chats? You could also explain why you sent those tweets to Kim — it might be good to get your side of that story "out there."


Let m know if you can talk today.


**Michael P. Brown**


Gordon Tilden Thomas & Cordell LLP

One Union Square

600 University Street, Suite 2915

Seattle, Washington 98101

t: 206.467.6477   d: 206.805.3162

w: gordontilden.com


GORDON
TILDEN
THOMAS    GTTC
CORDELL

2

**Subject:**                    RE:

On Tue, Jan 5, 2021 at 7:49 PM Michael P. Brown <mbrown@gordontilden.com> wrote:

Okay. I'll send the draft declaration in the morning. Will you be around tomorrow to review it?

**Michael P. Brown**

Gordon Tilden Thomas & Cordell LLP

One Union Square

600 University Street, Suite 2915

Seattle, Washington 98101

t: 206.467.6477    d: 206.805.3162

w: gordontilden.com





**From:** Sue M <|
**Sent:** Wednesday, December 30, 2020 6:18 PM
**To:** Michael P. Brown <mbrown@gordontilden.com>
**Subject:** Re: Lori

Figures.  What are your thoughts?

On Wed, Dec 30, 2020 at 5:55 PM Michael P. Brown <mbrown@gordontilden.com> wrote:

I spoke with Saltz today. They are planning to subpoena your Twitter account because they see that you closed your account and they think there might be evidence there about your connection to Katie. I did not disclose that you and I are in touch. Saltz even complained to me that you "threatened" him via DM.

Let me know if you want to talk about this.

Michael P. Brown

Gordon Tilden Thomas & Cordell LLP

One Union Square

600 University Street, Suite 2915

Seattle, Washington 98101

t: 206.467.6477   d: 206.805.3162

w: gordontilden.com



**From:** Sue M <
**Sent:** Wednesday, December 30, 2020 11:33 AM
**To:** Michael P. Brown <mbrown@gordontilden.com>
**Subject:** Re: Lori

Sure, what time?

On Wed, Dec 30, 2020 at 6:14 AM Michael P. Brown <mbrown@gordontilden.com> wrote:

Can you talk on the phone today?

Get Outlook for iOS

**From:** Sue M
**Sent:** Wednesday, December 30, 2020 5:37:45 AM
**To:** Michael P. Brown <mbrown@gordontilden.com>
**Subject:** Lori



5:27

🔒 mobile.twitter.com

← Search Twitter oo

**Log in**    **Sign up**

💬 2    ⟲    ♡ 1    ↑

... · 7h  oo

These ones were not about saltzy though.

💬 1    ⟲    ♡    ↑

**Michael_Saltz** @Mich... · 7h  oo

But they are helpful.  Do you have other screen shots of Lori Ann sending money to KJ in any videos before the lawsuit being filed?

💬 1    ⟲    ♡    ↑

Do you have any idea why they are targeting me?  I haven't done anything besides defend myself and others.  I have pages of them harassing me.

I was watching a live of Katie today.  I could not join her channel the link wasn't working so I sent her super chats.  My twitter account is gone I'm trying to get away from these people.  Anytime I do anything I they post it.  Just FYI.





5:27

mobile.twitter.com

Search Twitter

**Michael_Saltz**
@MichaelSaltzEsq

Replying to @_____ and
_____

Do you know or have
screenshots of what she said
in the chat ?   We will need it as
evidence in addition to what
she has already sent to my
DMs.

**EXHIBIT "2"**

**Table of Statements from Ms. Barnhart's Declaration**

| Statement | Undisputed/Supported by Documentary Evidence |
|---|---|
| "I am a resident of the State of Washington." ¶ 2. | Undisputed. |
| "In the past two years, I have used the following Twitter accounts: @bloodtall, @lab05059, and @lab050505." ¶ 3. | Undisputed. |
| "I initially found Ms. Paulson on Facebook in late 2019, wherein my account expressly stated that I am a resident of a city in Snohomish County, Washington. Ms. Paulson and I were official Facebook 'Friends' through our personal Facebook accounts." ¶ 4. | Undisputed.<br><br>Consistent prior statement: Dkt. 43-1 p. 186 of 221 ("She was Facebook friends with me too."). |
| "I was a paying member of Katie Joy Paulson's 'Without A Crystal Ball' YouTube channel from approximately January 2020 through August 2020. As a member of the 'Without A Crystal Ball Channel,' I paid $3.99 per month, not including tax. During the time period that I was a paid member of Ms. Paulson's channel from Washington, Ms. Paulson published numerous videos and other content maligning Plaintiffs in this case." ¶ 5. | Undisputed.<br><br>Consistent prior statement: Dkt. 43-1 p. 186 of 221 (Dkt 43-1 p. 104 of 221 ("I was a member to her channel for eight months from January 2020 until August 2020 at 3.99 per month."<br><br>Screenshot:<br><br><br>See Dkt. 30-1 ¶ 15<br><br>Also see video at approximately 35 minutes:<br>https://www.dropbox.com/s/tgc1s7m65nw0njo/2020.06.09%20100K%20Celebration%20Stream%20%20Join%20the%20Conversation.mp4?dl=0 . |

| | |
|---|---|
| "Throughout a large portion of 2020, I was communicating with Ms. Paulson on Twitter on an extremely frequent basis, and otherwise not less than several times a week. I also communicated with Ms. Paulson via email and direct messages." ¶ 6 | Consistent prior statement: Dkt. 43-1, p. 57 of 221 ("I reached out to her around April and I told her my life story."). Ms. Barnhart refreshed her recollection and remembered that she "reached out" to Ms. Paulson via email, to which Ms. Paulson responded via email.<br><br>Saltz Decl. ¶ 30 (hundreds of communications between Paulson and Barnhart).<br><br>Example Screenshots:<br><br><br><br> |





Fulmer Decl. Dkt. 29 ¶ 14 (disclosing direct messages between Paulson and Barnhart).  Screenshot:

| | |
|---|---|
| "I was not only a staunch supporter of Katie Joy Paulson and her 'Without A Crystal Ball' YouTube channel, I also developed the reputation of being her fierce protector. Katie Joy would brag about me being one of her ride or dies, and said that if anyone came after her, she knew that I, as one of her 'ride or dies' would shut them down." ¶ 6. | Saltz Decl. ¶ 30 (hundreds of communications between Paulson and Barnhart).  Fulmer Decl. Dkt. 29 ¶ 11 ("Ms. Paulson refers to an account that I believe belongs to Ms. Barnhart (Lori Ann/ @bloodtall) as one of her 'fiercest and loyalist' supporters."). Screenshot:  |
| "As a further example of Defendants expressly using me as their "bulldog" to go after Ms. Paulson's detractors and competitors that would speak negatively about Defendants, in or about July 2020, Defendants found themselves to the be the focus of significant negative attention when Defendants falsely published that a very large YouTube creator was being investigated by the Los Angeles Sherriff's Department for potential sex-related crimes involving children. Apparently | Undisputed. Confirming ¶ 7 Screenshot:  |

5

| | |
|---|---|
| there never was such an investigation. As such, Ms. Paulson publicly stated to another one of Defendants' 'bulldogs' that there was nothing to worry about with regard to the negative attention Defendants were receiving because: 'you and **Lori will be on the hunt**'" ¶ 7. | |
| "I have reviewed Ms. Paulson's supplemental declaration in support of her Motion to Dismiss. At paragraph 6, she states that she had been in contact over social media with me on only a few occasions. This is false. It is also false that she did not know that I was a resident of Washington. We were Facebook friends, and my state of residence was displayed on my profile. In addition, there had been instances over the course of our communications wherein I had specifically stated to Ms. Paulson that I lived in Washington." ¶ 8. | See above.<br><br>Additionally:<br><br>Consistent statement: "She was Facebook friends with me too." Dkt 43-1 p. 186 of 221.<br><br>Consistent statement: "I reached out to her around April and I told her my life story." Dkt. 43-1 p. 57 of 221. It is nearly impossible for one to tell their "life story" without stating where that "life story" is being lived. |
| "On several occasions, Ms. Paulson asked me to do certain things for Defendants, such as mass flagging[1] content of other detractors' and competitors' YouTube channels. Defendants would ask me and others to help mass flag competitors' YouTube channel that made negative comments about Defendants in order to have their platform demonetized or taken away. Sometimes the orders to mass flag someone's channel or content were made by Ms. Paulson publicly, and sometimes the orders were sent by Ms. Paulson to me in private messages on Twitter. One such account I was told to flag was Lil Red, a YouTube creator and competitor of Defendants, who was publishing negative comments regarding Ms. Paulson. On one occasion, I received a private message from Ms. Paulson instructing me to also flag a YouTube creator and competitor's | See screenshot of request by Paulson to Barnhart to perform a task:<br><br><br><br>Saltz Decl. ¶ 41, Compilation video of Ms. Paulson issuing instructions to her viewers to "mass flag" Lil Red's video/channel:<br><br>https://www.dropbox.com/s/m0cz7z6mvmefcyi/Why%20You%20SHOULDN%E2%80%99T%20Break%20TOS%20-%20Deep%20in%20a%20Thot%2011.09.2020.mp4?dl=0 |

---

[1] Flagging content means reporting violations of Terms of Service or inappropriate content to YouTube. See: https://support.google.com/youtube/answer/2802027?=en&ref_topic=9387085 .

| | |
|---|---|
| YouTube channel named Sharell's World. As her agent, I followed her directions as requested and reported the channels to YouTube for having inappropriate content." ¶ 9. | Saltz Decl. ¶ 45, 46, 47. Text screenshot of Sharell's World flagging:<br><br><br><br>As to the private instruction, Ms. Paulson admits to flagging certain channels and to private conversations with Ms. Barnhart, a person to whom she previously stated she had no previous connection. Specifically, in Ms. Paulson's *Second Supplemental* Declaration in Support of Defendants' Motion to Dismiss, Ms. Paulson admits that this conversation took place with the caveat that she only instructed Ms. Barnhart <u>how</u> to flag Sharell's video, not necessarily to flag the video, which appears to be a distinction without much of a difference. See Decl. Paulson, Dkt. 43-2 ¶ 7. Furthermore, due to the above video's documentation of Ms. Paulson's long and unenviable history of soliciting mass flagging, it appears to Plaintiffs that Ms. Paulson's attempt to distinguish her version of said conversation between herself and Ms. Barnhart is, at best, dubious, and is directly inconsistent with the documented mass flagging requests in said video. |
| "Defendants would also use me as their agent to perform other tasks, such as deliver messages to people on Twitter that Defendants had blocked. Below is a true and correct copy of a screenshot of a Twitter conversation wherein Ms. | See Dkt. 38-1 ¶ 10 screenshot of request by Paulson to Barnhart to perform a task: |

| | |
|---|---|
| Paulson gave me such an instruction to perform on her behalf." ¶ 10. |  |
| "Each and every time I was asked to do something or did something on behalf of, for, or at the request of Defendants, I was physically located in Washington. Again, this was a fact I did not hide from Defendants, and to the best of my recollection, frequently disclosed to Defendants." ¶ 11. | Undisputed. |
| "In August 2020, I began to disagree with the toxic environment Ms. Paulson was creating with her content. As such, I began to distance myself from being Defendants' agent that would do Defendants' bidding and defending, and I cancelled my paid membership to Defendants' YouTube channel." ¶ 12. | Saltz Decl. ¶ 48, Exhibit "2". Screenshots: |



"Ms. Paulson was disappointed in the separation, and said that she adores me no matter what happens. It is my understanding that this statement establishes that the connection that I had with Defendants in general, and Ms. Paulson in particular, was far more significant than what Ms. Paulson represented in her declaration to the Court." ¶ 12.

Saltz Decl. ¶ 48, Exhibit "2" Screenshot:



Specifically, on August 14, 2020, a creator named Unirock posted a livestream video called "Live scope with kate without a crystal ball":

https://www.dropbox.com/s/ny9ol3dvg5a7xxk/2020.08.14%20Periscope%20unirocktv%20%20Live%20scope%20with%20kate%20without%20a%20crystal%20ball.mp4?dl=0

At approximately 56 minutes, Ms. Paulson says: "Lori is so mad at me for literally trying to end drama with um... I'm sorry I disappointed you Lori... I am... with Leslie... but I have to do this for myself. And I have to move forward. And just like I can't you know...I couldn't stay mad at Kyle forever

actually a good friend of mine… I was friendly with Leslie… I don't know why anyone wants to perpetuate this drama."

At approximately 70 minutes into the video, Ms. Paulson says: "This… proves my point…Now Lori's saying that certain other people are looking better every day…"

Remarkably, Ms. Paulson is so familiar and connected with Ms. Barnhart, that she can spot when someone is trying to pretend to be Ms. Barnhart, and recognize which person is the real "Lori Ann" and which person is the "fake" Lori Ann. At approximately 78 minutes into video, Ms. Paulson states:

"There's two Lori Anns in here…There's someone that's fake."

Also see Dkt. 30-1, Saltz Decl. ¶ 15 ("my attention was brought to a video on Defendants' WOACB YouTube channel entitled "100K Celebration Stream - Join the Conversation," which was uploaded to said channel on June 9, 2020. In watching said video, I personally witnessed, at approximately 35 minutes therein, a person I know to be Defendant Paulson display on her video screen a message from Lori Ann's YouTube account along with a picture of a person I have verified through Google's face recognition search feature to be Lori Ann Barnhart. I then heard Defendant Paulson simultaneously say: "Oh, this one. Lori. Don't ever get into it with Lori. Lori remembers your names. Lori is the catalog. Lori didn't like me at one point and now she is my best friend."

| | |
|---|---|
| | Screenshot:<br><br>Video              link:<br>https://www.dropbox.com/s/tgc1s7m65n<br>w0njo/2020.06.09%20100K%20Celebra<br>tion%20Stream%20%20Join%20the%2<br>0Conversation.mp4?dl=0 . |
| "Though I cancelled my membership, I still remained friendly with Ms. Paulson after this lawsuit was filed in October 2020. As a result of my continued friendship with Ms. Paulson and my prior reputation of being a staunch protector "bulldog" of Ms. Paulson, I started to receive messages from people on Twitter who were trying to discredit me. In their efforts to discredit me, on or about November 5, 2020, people had stated not only that I lived in the State of Washington, but because I had previously made it generally known that I previously worked for the government, that I was the person publicly listed on the internet as Lori Ann Barnhart that worked at the Department of Transportation. Although that person listed on the website for the Washington Department of Transportation has the same exact name as me, and is a government employee from the same state as me, that is not me. However, **I did not _publicly_ correct these people** twitter who published this information on or about November 5, 2020 as if it were fact and otherwise allowed them to continue to believe that I worked for the Department of | Barnhart Decl., Dkt. 38-1 ¶ 13. Screenshot:<br><br><br>Consistent Statements that Ms. Barnhart did _not publicly_ do anything to correct the misinformation about working for the Washington Department of Transportation: See Dkt. 43-1 pgs. 37 of 221, ("my twitter is private"), and 144 of 221 ("Also my twitter had been made private. (Meaning only the people I followed on twitter could see my tweets) for at least a month. I also blocked some accounts."). |

| | |
|---|---|
| Transportation. Instead, I am a retired administrator for a federal agency. As such, I take responsibility for my part in allowing this misunderstanding to be accepted as fact, and for that I apologize." ¶ 13 (emphasis added). | |
| "Throughout 2020, I had communicated with Ms. Paulson through email, social media, direct messages, and live chats. As stated above, and while I was a paying member, we regularly communicated multiple times per week. In fact, Ms. Paulson and I were Facebook friends, wherein my account expressly stated that I am a resident of a city in Snohomish County, Washington. I have shared some of my most intimate secrets via email with Ms. Paulson, including personal information about mental health issues, which is something I would not have done with someone that was merely an acquaintance." ¶ 14. | Consistent prior statement: Dkt. 43-1, p. 57 of 221 ("I reached out to her around April and I told her my life story."). Ms. Barnhart refreshed her recollection and remembered that she "reached out" to Ms. Paulson via email, to which Ms. Paulson responded via email.<br><br>Saltz Decl. ¶ 30 (hundreds of communications between Paulson and Barnhart).<br><br>Example Screenshots:<br><br><br><br> |

12





Fulmer Decl. Dkt. 29 ¶ 14 (disclosing direct messages between Paulson and Barnhart). Screenshot:



Saltz Decl. ¶ 30 (hundreds of communications between Paulson and Barnhart).

14



Fulmer Decl. Dkt. 29 ¶ 11 ("Ms. Paulson refers to an account that I believe belongs to Ms. Barnhart (Lori Ann/ @bloodtall) as one of her 'fiercest and loyalist' supporters."). Screenshot:

Saltz Decl. ¶ 48, Exhibit "2" Screenshot:

On August 14, 2020, a creator named Unirock posted a livestream video called "Live scope with kate without a crystal ball":

https://www.dropbox.com/s/ny9ol3dvg5a7xxk/2020.08.14%20Periscope%20unirocktv%20Live%20scope%20with%20kate%20without%20a%20crystal%20ball.mp4?dl=0

At approximately 56 minutes, Ms. Paulson say: "Lori is so mad at me for literally trying to end drama with um… I'm sorry I disappointed you Lori…I am… with Leslie... but I have to do this for myself. And I have to move forward. And just like I can't you know… I couldn't stay mad at Kyle forever actually a good friend of mine… I was friendly with Leslie… I don't know why anyone wants to perpetuate this drama."

At approximately 70 minutes into the video, Ms. Paulson says: "This…proves my point…Now Lori's saying that certain other people are looking better every day…"

Remarkably, Ms. Paulson is so familiar and connected with Ms. Barnhart, that she can spot when someone is trying to pretend to be Ms. Barnhart, and recognize which person is the real "Lori Ann" and which person is the "fake" Lori Ann. At approximately 78 minutes into video, Ms. Paulson states:

"There's two Lori Anns in here…There's someone that's fake."

Also see Saltz Decl., Dkt. 30-1, ¶ 15 ("my attention was brought to a video on Defendants' WOACB YouTube channel entitled "100K Celebration Stream - Join the Conversation," which was uploaded to said channel on June 9, 2020. In

watching said video, I personally witnessed, at approximately 35 minutes therein, a person I know to be Defendant Paulson display on her video screen a message from Lori Ann's YouTube account along with a picture of a person I have verified through Google's face recognition search feature to be Lori Ann Barnhart. I then heard Defendant Paulson simultaneously say: "Oh, this one. Lori. Don't ever get into it with Lori. Lori remembers your names. Lori is the catalog. Lori didn't like me at one point and now she is my best friend.")

Screenshot:



Video link: https://www.dropbox.com/s/tgc1s7m65nw0njo/2020.06.09%20100K%20Celebration%20Stream%20%20Join%20the%20Conversation.mp4?dl=0 .

Confirming ¶ 7 Screenshot:



17

| | |
|---|---|
| "On or about December 2, 2020, after Defendants filed the Motion to Dismiss, Ms. Paulson became distant and it appeared to me that Ms. Paulson was attempting to minimize our connection to one another. I have reviewed Ms. Paulson's declaration that she filed along with the Motion to Dismiss, and paragraph 6 of her declaration appears to be false. Specifically, perhaps we were not 'best friends' as she stated we were in her June 9, 2020 video, but we were significantly closer than the average fan or paid member. This is especially so, given that she had reached out to me in the State of Washington to perform tasks on Defendants' behalf such as flag other competitors' YouTube accounts and had publicly endorsed my being her "bulldog" against her detractors. Ms. Paulson knew that she had subscribers and paying members, including me, in the State of Washington." ¶ 15. | I have also reviewed Defendants' June 9, 2020 YouTube video, in which Ms. Barnhart participates and Ms. Paulson refers to Ms. Barnhart as her "best friend." See Decl. Saltz, ¶ 15, Dkt. 30-1. Also see Unirock August 14, 2020 "Live scope with kate without a crystal ball" video, in which Ms. Paulson references her relationship with Ms. Barnhart. https://www.dropbox.com/s/ny9ol3dvg5 a7xxk/2020.08.14%20Periscope%20uni rocktv%20%20Live%20scope%20with %20kate%20without%20a%20crystal% 20ball.mp4?dl=0 |
| "I began to see Ms. Paulson's propensity for dishonesty while at the same time observing that she was creating distance for what I can only imagine was to conceal a close relationship with a member/subscriber from the State of Washington, and to falsely inform the Court that she is unaware of any connection with the State of Washington." ¶ 16. | Undisputed. Ms. Barnhart is a known member/subscriber from Washington, yet Defendant Paulson stated in her declaration in support of her Motion to Dismiss that she had no personal knowledge of any subscribers in the State of Washington. Dkt. 19, ¶ 4. |
| "I have reviewed the Declarations of Kim Fulmer and Michael J. Saltz filed in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. I can hereby certify that, except for the statement at paragraph 10 of Kim Fulmer's declaration regarding me working at the Department of Transportation, the statements in the declarations appear to be accurate. That said, I have done and said many things in | This statement is supported by documentary evidence provided herein and attached to the identified declarations. See Saltz Decl. Dkt. 30-1; See Fulmer Decl. Dkt. 29. |

| | |
|---|---|
| my past that I regret and have previously contacted Ms. Fulmer to make amends, and Ms. Fulmer publicly acknowledged my apology. The criminal charges referenced in Ms. Fulmer's declaration were ultimately dismissed pursuant to an agreement I made with the Prosecutors. Aside from the events surrounding the incident discussed in the criminal complaint, I have no criminal record." ¶ 17. | |
| "I am profoundly sorry to Ms. Fulmer and to anyone else for anything they may have perceived that I posted online as a threat to their safety. I have already apologized to her and other creators for my actions." ¶ 18. | ¶ 18 Screenshot:<br><br><br><br>Saltz Decl. ¶ 48, Exhibit "2":<br><br> |
| "Shortly after reading the declaration of Kim Fulmer that contained the wrong information about my employment, I was concerned that a person who was not me was going to be contacted to be a witness in this lawsuit." ¶ 19. | Consistent statement: See Dkt. 43-1, pgs. 33 of 221 ("I hope that other Lori isn't being harassed."), 47 of 221, ("Look what they have done to me and the other Lori"), 53 of 221, 75 of 221 ("I contacted you because of the doxing of the wrong Lori"), 88 of 221, 95 of 221, 146 of 221 |

| | |
|---|---|
| | ("Do they know I am not the other Lori yet?"), 160 of 221 ("I think they still believe that I am the other Lori."), 165 of 221 ("Do they know I am not the other Lori?"), 166 of 221, 177 of 221 ("They can show up at Lori's house or work, harass her and her family now too"), and 186 of 221 ("Can you tell me what is going on with the other Lori?"). |
| "I therefore contacted Ms. Paulson through Twitter direct messages on or about December 24, 2020 and informed her of my concern. Ms. Paulson informed me that she was not able to speak about the case. I then responded that it was my intention to call Plaintiffs' attorneys to notify them about the issue and to see if they could do anything to correct it. Ms. Paulson told me expressly to not contact Plaintiffs' Counsel, but to contact her attorney, Michael P. Brown, instead." ¶ 19. | This statement is supported by direct messages referenced by Mr. Brown in conjunction with his motion. See Dkt. 43-2 ¶ 3. The only claimed discrepancy is whether Ms. Paulson informed Ms. Barnhart to not contact Mr. Saltz. *Id.*<br><br>However, Plaintiffs' Counsel is skeptical to accept Ms. Paulson's purported screenshots of said conversation, and have reason to believe said screenshots are of a dubious origin.<br><br>Defendant Paulson has openly admitted in several videos that she has the knowledge and ability to alter screenshots. As such, we believe that Ms. Barnhart's rendition of events is more likely the correct one. This is further supported by the fact that Ms. Paulson has had to supplement her own declarations several times with contradictory statements.<br><br>We have personally viewed no less than two videos regarding Ms. Paulson boasting about her knowledge and skill regarding altering and/or fabricating screenshots on various social media platforms.[2] |

---

[2] These videos are on Instagram on December 4, 2019, and on YouTube on January 11, 2020. True and correct copies of said videos are available in a Dropbox at:
https://www.dropbox.com/s/443gfocupshtima/2019.12.04%20WOACB%20IG%20Live.mp4?dl=0

https://www.dropbox.com/s/xgxc4pteua2ugyz/2020.01.11%20My%20Final%20Response%20about%20the%20Scre%2An%20Shots%20with%20Rece%2Apts.mp4?dl=0

| | |
|---|---|
| "From the very first interaction I had with Mr. Brown, I felt he was being misleading. He led me to believe that Plaintiffs filed their opposition right before Christmas to intentionally mess with me, and not because that was a court imposed deadline." ¶ 20. | This is confirmed by documentary evidence. This statement is reiterated in an email from Mr. Brown to Ms. Barnhart dated January 6, 2021. See Dkt. 43-1 p. 91 of 221 ("They purposely did that late Christmas Eve because they knew nothing could be done about it until the following Monday."). Mr. Brown confirms in his declaration that he received an email from Ms. Barnhart that she was under the misconception that Plaintiffs intentionally filed the Kim Fulmer declaration on Christmas Eve, just to mess with Ms. Barnhart. Mr. Brown then also admits that, instead of taking the time to correct said misconception, he took the time to respond to Ms. Barnhart's email confirming her misconception, thus continuing his efforts to portray Plaintiffs' Counsel in a negative light to Ms. Barnhart. Dkt. 43-1, ¶ 42; p. 92 of 221 ("The Christmas Eve timing of this is especially nice, right?). At no time does Mr. Brown explain that the filing date, December 23, 2020, was a court-imposed deadline, and was not a date chosen by Plaintiffs. |
| "On December 30, 2020 Mr. Brown informed me that Plaintiffs' Counsel was planning to subpoena my Twitter account, which caused me concern. He stated, 'they think there may be evidence there about your connection to Katie. I did not disclose that you and I are in touch. Saltz even complained to me that you 'threatened' him via DM." ¶ 21. | This is confirmed by documentary evidence. Dkt. 43-1 p. 42 of 221. Mr. Brown also stated in an email that for the "time being," it would be best if Ms. Barnhart "not to make any contact with [Defendant Paulson] (and vice versa)." Dkt. 43-1 p. 43 of 221. |
| "Mr. Brown thereafter sought to have me sign a declaration on behalf of Defendants that did nothing more than attack and malign Plaintiffs' counsel, which I thought to be inappropriate and ultimately did not do. By way of example, Mr. Brown, in an email dated December 24, | This is confirmed by documentary evidence. Dkt. 43-1 p. 198 of 221. Mr. Brown denies that he "instructed" Ms. Barnhart to file bar complaints. Ms. Barnhart does not allege that he did so. She said he "encouraged" her to do so by giving it to her as an option, albeit one |

| | |
|---|---|
| 2020 at 3:38 p.m., tried to encourage me to file state bar complaints against one of Plaintiffs' attorneys and otherwise suggest that I should perceive Plaintiffs' Counsel's private attempts to informally obtain information from me as a threat." ¶ 22. | that does not provide immediate results. Either way, this is a minor distinction without much of a difference. See Dkt. 60, Ex. E, p. 3.<br><br>Ms. Barnhart also confirmed that, in addition to the December 24, 2020 email [Dkt. 43-1 p. 31 of 221], there were follow up phone calls with Mr. Brown on this subject and wherein Ms. Barnhart interpreted Mr. Brown's words and actions as encouragement to file a state bar complaints against Mr. Saltz. |
| "On January 6, 2021, at 6:18 p.m. Mr. Brown sent me an email stating that he made a signature page separate from the rest of the declaration so that he could make changes and I would not have to re-sign the declaration if he made tweaks… Mr. Brown also informed me that Plaintiffs' Counsel was going to serve me with a subpoena to preserve my social media accounts that I had deleted and to provide Plaintiffs with access to any remaining communications that I may have had with Ms. Paulson. I said that I was going to go to Legal Aid to get legal assistance with responding to the subpoena. On January 8, 2021, I informed Mr. Brown that I was willing to turn over my accounts to Plaintiffs' Counsel in order to resolve this issue. Mr. Brown suggested to me via email on January 8, 2021 that I should object to the subpoena for the purpose of delaying my response to the subpoena, which upset me because I did not want to delay my exit from this case for any reason." ¶ 23. | This is confirmed by documentary evidence. Dkt. 43-1 Exh. "B" p. 117 of 221, 145 of 221, 171 of 221, 171 of 221, 173 of 221, 177 of 221, 186 of 221. |
| "Mr. Brown stated in an email to me dated January 10, 2021 at 6:13 p.m., 'I am preparing something to file tomorrow that addresses what they did to you, but does not require you to file any statement if you | This is confirmed by documentary evidence. Dkt. 43-1 p. 182 of 221. |

| | |
|---|---|
| don't want to. I want the court to know what he's doing to harass you. I can't guarantee that the judge will do anything about it, but I want to try. His behavior is disgusting. I recommend that you sit tight, accept service if they come to your door, and then we can take it form (sic) there. You are not in any trouble.' Such statement confirmed to me that I apparently was a client of Mr. Brown's, in that I understood his statement to mean that he was inserting himself into my situation of having to respond to a subpoena." ¶ 24. | |
| "On January 11, 2021, Mr. Brown thereafter offered to represent me at no charge in responding to said subpoena, stating, "You don't need to spend money or hire a lawyer to respond to the subpoena or file a declaration. I'd like to stand up for you by filing your declaration if you'd let me. It costs you nothing." This statement made me very suspicious of Mr. Brown's motives, as it was my understanding that a truthful and honest response to the subpoena would not be in Defendants' best interests, but would otherwise be in mine. Specifically, I was not comfortable with having Mr. Brown controlling the production of my documents and/or other evidence that would likely be detrimental to Defendants' pending motion attacking jurisdiction and ultimately Defendants' defenses to Plaintiffs' claims." ¶ 25. | This is confirmed by documentary evidence. Dkt. 43-1 p. 195 of 221. |
| "I did not feel comfortable with Mr. Brown's offer of representation and stated intent to file objections solely for the purposes of delay of the subpoena. I also did not feel comfortable that Mr. Brown proceeded to give me legal advice in this case regarding how to respond to discovery and what I should say in the state bar complaints that he was | This paragraph concerns Ms. Barnhart's general impressions regarding Mr. Brown's aforementioned written communications, and is confirmed by documentary evidence. Dkt. 43-1.

Also see: Dkt. 43-1, pgs. 33 of 221 ("I hope that other Lori isn't being harassed."), 47 of 221, ("Look what they |

encouraging me to file against Plaintiffs' counsel. I was concerned that there would be a conflict of interest in representing me and Ms. Paulson because the information that I would be providing would contradict the statements Ms. Paulson made in her declarations and therefore would be contrary to her interests. At no time prior to giving me legal advice did Mr. Brown advise me of any potential or actual conflicts of interest with regard to his representation of the Defendants and myself as a potential witness against Defendants. All I wanted to do was to make sure that everyone knew the person with my name working at the Washington Department of Transportation was not me after the declaration of Kim Fulmer was filed. I wholeheartedly did not expect that Defendants' Counsel would attempt to use me so blatantly as a pawn in such an inappropriate way." ¶ 26.

have done to me and the other Lori"), 53 of 221, 75 of 221 ("I contacted you because of the doxing of the wrong Lori"), 88 of 221, 95 of 221, 146 of 221 ("Do they know I am not the other Lori yet?"), 160 of 221 ("I think they still believe that I am the other Lori."), 165 of 221 ("Do they know I am not the other Lori?"), 166 of 221, 177 of 221 ("They can show up at Lori's house or work, harass her and her family now too"), and 186 of 221 ("Can you tell me what is going on with the other Lori?").

Also see: Dkt. 43-1 pgs. 44 of 221 ("Maybe it would just be easier if I went and met with him myself…I have nothing to hide.), 47 of 221 ("For all I care they can look at all my internet activities.), 171 of 221 ("I guess I can just call [Mr. Saltz] and authorize YouTube and twitter to give him all of it."), and 188 of 221 ("I will call [Mr. Saltz] tomorrow.").

Also see: Dkt. 43-1 pgs. 45 of 221 ("I understand that impulse but you need to understand the type of person he is."), 193 of 221 ("Can you please talk with me before you do anything?"), and 200 of 221 ("I understand this is very stressful. You should at least speak with me about it."); also see Dkt. 52 pg. 33 of 39 ("Someone is talking to me on a sock account telling me not to trust Saltzy.").

Also see: Dkt. 43-1 Exb. "B" pgs. 45 of 221 ("Do you have the ability to pay for your own lawyer if they do issue a subpoena?"), 159 of 221 ("I can help with that."), 167, 168, 182 ("accept service if they come to your door, and then we can take it from there."), 195 ("You don't need to spend money or hire a lawyer to respond to the subpoena"), and 198 ("I can give you some assistance

| | |
|---|---|
| | with respect to responding to the subpoena."). |
| | Also see: Dkt. 43-1 pgs. 30 of 221 ("is there anything I can do, or should I try to ignore it"), 31 of 221 (legal advice), 39 of 221 ("Yes I would like to see what can be done"), 40 of 221 (legal advice), 43 of 221 (responding to missing email asking for legal advice), 48 of 221 (asking for legal advice), 49 of 221 (legal advice), 74 of 221 (legal strategy), 126 of 221 (legal strategy), 130 of 221 ("that would delay everything and the judge might just say you don't have to respond."), 167 of 221 (legal advice), 168 of 221 (legal advice), 176 of 221 (legal advice), 182 of 221 ("you have done nothing illegal…..I recommend that you …"), 191 of 221 (legal advice), 195 of 221 (legal advice), and 205 (legal advice and strategy). |
| "I also did not feel comfortable with Mr. Brown wanting me to sign a declaration stating that I was threatened by Mr. Saltz, when Mr. Saltz has not threatened me. Nor have I ever **told Mr. Brown** that Mr. Saltz threatened me. Specifically, Mr. Brown. stated: "We are filing something today that addresses the threat Saltz recently made to you… It would be great if you would state that you took it as a threat and felt intimidated."   ¶   27. (Emphasis added). | This paragraph concerns Ms. Barnhart's stated reasons that she cut off communications with Mr. Brown on January 11, 2021 and thereafter contacted Plaintiffs' Counsel on January 12, 2021. Additionally, this statement is confirmed by documentary evidence. See, e.g. Dkt. 52, Ex. C.<br><br>Ms. Barnhart did not tell Mr. Brown in her 1,500-word statement that Mr. Saltz threatened her, or at any time prior. See Dkt. 43-1 pp. 56-62 of 221 Rather, Mr. Brown is the one that informed Ms. Barnhart on January 6, 2021 that Mr. Saltz threatened to add her to the lawsuit. See Dkt. 43-1, p. 83 of 221, stating, "he threatened to add you to this lawsuit." Mr. Brown's email was in response to Ms. Barnhart informing him that she was merely being added to a witness list. See Dkt. 43-1, p. 82 of 221. Any mention of the word "threatened" by Ms. Barnhart |

| | |
|---|---|
| | after Mr. Brown's email was in response to Mr. Brown informing her that she had been threatened – not a response to an actual threat by Mr. Saltz. |
| "Based on the overall impression that Mr. Brown left with me during my interactions with him during the past few weeks, I cut off all communications with Defendants and Defendants' attorneys. To be certain, I was shocked and horrified that Defendants and their attorneys who were apparently supposed to be looking out for my best interests, especially since they said they were representing me in this matter, ignored my express requests to speedily take action to correct the record in regard to the false attribution of my employment (which was my fault), and instead hide the error from Plaintiffs for their tactical advantage. Despite that Mr. Brown knew about the error since December 24, 2020, Defendants and Defendants' Counsel have apparently done nothing to inform Plaintiffs' counsel to correct the error, which is expressly against my wishes. I therefore reached out to Plaintiffs' Counsel by telephone for the first time on January 12, 2021 to give them the foregoing information for the purposes of setting the record straight, and to inform them for the first time about the existence of the facts contained in this declaration." ¶ 28. | This paragraph concerns Ms. Barnhart's stated reasons that she cut off communications with Mr. Brown on January 11, 2021 and thereafter contacted Plaintiffs' Counsel on January 12, 2021. <br><br> Ms. Barnhart also gave Mr. Brown a technical excuse for not signing the draft documents that was obviously just an excuse to not sign Mr. Brown's documents. See Dkt. 52 p. 37 of 39 ("I don't know how to download everything on my phone so it won't be done."). <br><br> Also see: Dkt. 43-1 pgs. 44 of 221 ("Maybe it would just be easier if I went and met with him myself…I have nothing to hide.), 47 of 221 ("For all I care they can look at all my internet activities.), 171 of 221 ("I guess I can just call [Mr. Saltz] and authorize YouTube and twitter to give him all of it."), and 188 of 221 ("I will call [Mr. Saltz] tomorrow."). <br><br> Also see: Dkt. 43-1, pgs. 33 of 221 ("I hope that other Lori isn't being harassed."), 47 of 221, ("Look what they have done to me and the other Lori") 53 of 221, 75 of 221 ("I contacted you because of the doxing of the wrong Lori"), 88 of 221, 95 of 221, 146 of 221 ("Do they know I am not the other Lori yet?"), 160 of 221 ("I think they still believe that I am the other Lori."), 165 of 221 ("Do they know I am not the other Lori?"), 166 of 221, 177 of 221 ("They can show up at Lori's house or work, harass her and her family now too"), and |

| | 186 of 221 ("Can you tell me what is going on with the other Lori?").<br><br>Also see: Dkt. 43-1 p. 166 of 221 ("I don't know. If they knew it would make it even more remarkable that they haven't corrected the record."). |
|---|---|