1

2

THE HONORABLE BARBARA J. ROTHSTEIN

3

4

5

6

7          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
8                  AT SEATTLE

9

10   TATIANA WESTBROOK, an individual;
     JAMES WESTBROOK, an individual; HALO
11   BEAUTY PARTNERS, LLC, a Nevada Limited    NO. 2:20-cv-01606-BJR
     Liability Company,
12
                        Plaintiffs,            **DECLARATION OF MICHAEL J.**
13                                             **SALTZ IN SUPPORT OF PLAINTIFFS'**
            v.                                 **OPPOSITION TO DEFENDANTS'**
14                                             **MOTION FOR SANCTIONS**
     KATIE JOY PAULSON, an individual;
15   WITHOUT A CRYSTAL BALL, LLC, a
     Minnesota Limited Liability Company; and
16   DOES 1 through 100, inclusive,

17                      Defendants.

18

19

20

21

22

23

24

25

26

**DECLARATION OF MICHAEL J.**          **CARROLL, BIDDLE, & BILANKO, PLLC**
**SALTZ -1**                            1000 2nd Avenue, Suite 3100
(2:20-CV-01606-BJR)                     Seattle, WA  98104

I, MICHAEL J. SALTZ, hereby state as follows:

1.      I am an attorney admitted *pro hac vice* to appear before the U.S. District Court for the Western District of Washington in the above-captioned matter, and am a partner of Jacobson, Russell, Saltz, Nassim & de la Torre, LLP, counsel for Plaintiffs Tatiana Westbrook, James Westbrook, and Halo Beauty Partners, LLC in this matter. I am over the age of eighteen and am competent to testify to the facts stated herein.

## A.  INITIAL INTERACTIONS WITH MS. BARNHART

2.      Prior to filing the complaint in this case, I personally had never heard of Lori Ann Barnhart ("Ms. Barnhart"). However, shortly after the filing of said lawsuit, Ms. Barnhart took to Twitter on or about November 4, 2020 and accused me of being an imposter and that impersonating an attorney was a crime. I responded by telling her that I was, in fact, a real attorney and invited her to our offices to come meet me and our legal team. Ms. Barnhart wrote back that she was of the belief that professionals were not on Twitter and that she certainly would not send information to an attorney over Twitter. I responded to Ms. Barnhart that my address, email address and telephone number were on the pleadings of which she had tweeted a copy, and that my invitation to come meet us and help us collect evidence stands. Ms. Barnhart then wrote back that I should thank her for sharing my information since my Twitter account is not verified and I am followed by random accounts with unusual names. I then thanked her for believing in us. Ms. Barnhart then responded that I should get Twitter to verify my account. I then responded to Ms. Barnhart that I did not personally know how to get a Twitter account verified but that I would not be opposed to it. I also asked Ms. Barnhart if she knew how I could start the verification process. Ms. Barnhart said she did not. Below are true and correct screenshots of this initial interaction between myself and Ms. Barnhart:

DECLARATION OF MICHAEL J.
SALTZ -2
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104



**Lori Ann** 💫 🔒 @Bloo... · 11/6/20

Perhaps I had some info on Katie I wanted to send. I certainly wouldn't send it through this twitter account I would want the actual firm. I've dealt with a lot of federal lawsuits while working for the federal government. Professionals aren't on twitter.

💬 4    🔁 1    ♡    ⬆️    📊

**Michael_Saltz** @Mich... · 11/6/20

My email has been posted a few times. It is also on the section of the pleading that you tweeted, along with my office address and office phone number. My invitation still stands. You can help us collect more evidence throughout the night. Bring food!

**Michael_Saltz** @Mich... · 11/6/20

Replying to @Bloodtall @cuttingdawn333 and 4 others

I did. It cites State Court rules and we are in Federal Court. And thank you for believing in us. We have been receiving a ton of messages and emails giving us information and evidence. If Trump has taught us anything, it is that Twitter is an effective way to reach people.

💬 4    🔁 1    ♡ 50    ⬆️

**Lori Ann** 💫 🔒 @Bloo... · 11/6/20

Maybe get a verified account then since your such a big bad attorney 😂



**Lori Ann** 💫 🔒
@Bloodtall

You can thank me for sharing your information, since your twitter account isn't verified and you follow random accounts like a hairy ball, someone with a green face, a Pantyliner, etc. very professional. Maybe read the letter you were sent. 😘



**Michael_Saltz**
@MichaelSaltzEsq

Replying to @Bloodtall @cuttingdawn333 and 4 others

Believe it or not, I have no idea how that works. I only know about the data side of twitter because of needing information from twitter in a criminal contempt proceeding I pursued in Iowa. I would not be opposed to it. Do you know how that works? Are you **verified** too?

11:06 PM · 11/6/20 · Twitter Web App

**DECLARATION OF MICHAEL J. SALTZ -3**
(2:20-CV-01606-BJR)

1
2
3
4
5
6
7
8
9
10
11



12     3.     At no time during this interaction did I threaten Ms. Barnhart or tell her that we

13 were going to make her a party to this lawsuit. In fact, it was my understanding that Ms.

14 Barnhart's Twitter attacks aimed at myself had been diffused and our Twitter conversation ended

15 in a collegial and courteous manner.

16     4.     I have never stated or "threatened" that I would add Ms. Barnhart to the lawsuit.

17 **B.  THE KIM FULMER DECLARATION**

18     5.     After the Twitter interaction with Ms. Barnhart, I began to look into Ms. Barnhart.

19 I eventually learned that Ms. Barnhart was a long-time supporter of Defendant Katie Joy Paulson

20 ("Ms. Paulson") and that she lived in the state of Washington. I was also informed that Ms.

21 Barnhart was purportedly an employee of a state agency – a fact Ms. Barnhart *did not* publicly

22 deny or expressly correct despite having the opportunity to do so.[1] Below is a true and correct

23 copy of a redacted screenshot from Twitter making said then-unrebutted claim that Ms. Barnhart

24 (who went by the Twitter handle @Bloodtall) was an employee of a state agency:

25

26

---

[1] *See* Signed Barnhart Decl., Dkt. 38-1 ¶ 13.

**DECLARATION OF MICHAEL J.**
**SALTZ -4**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

1
2
3
4
5
6
7
8
9



10    6.    This information became relevant after Ms. Paulson filed a Motion to Dismiss for

11  lack of personal jurisdiction, Dkt. 17, which was accompanied by a sworn declaration from Ms.

12  Paulson containing the following statements at paragraph 4 therein: "To my knowledge, neither I

13  nor WOACB has any sponsors or subscribers in Washington. To my knowledge, neither I nor

14  WOACB derives any income from the State of Washington."

15    7.    In or about December 2020, I was informed by a former moderator of Ms.

16  Paulson's video chats, Kim Fulmer, that Ms. Barnhart had previously threatened her purportedly

17  due to a related dispute Ms. Fulmer had with Ms. Paulson. I was informed that Ms. Fulmer

18  investigated Ms. Barnhart and found that Ms. Barnhart was a resident from the state of

19  Washington and had a public Washington criminal record, and that Ms. Barnhart's name

20  appeared on a publicly available list of state agency employees.

21    8.    Ms. Fulmer's inclusion of the top page of the charging documents in her

22  Declaration was for the proper purpose of establishing: 1) that Ms. Barnhart is a Washington

23  resident and has been a Washington resident for several years; and 2) that Ms. Fulmer's stated

24  fear for her safety stemming from Ms. Barnhart's purported threats was reasonable based upon

25  Ms. Barnhart's history. Below is a screenshot I obtained from Ms. Barnhart's Twitter account

26  regarding Ms. Barnhart's stated position on this matter on August 22, 2020:

1
2
3
4
5
6
7
8
9
10
11



12    9.    Further, Ms. Fulmer's declaration intentionally left out the details of the actual

13  acts described in said charging documents, including that they involved actual physical harm to a

14  person, and the fact that Ms. Barnhart completed a diversion program to get said charges

dismissed.[2]

15  C.  **MESSAGES FROM MS. BARNHART AFTER THE FULMER**
16      **DECLARATION**

17    10.    The day after the Fulmer Declaration was filed, on December 24, 2020, I received

18  unsolicited direct messages to my Twitter account from Ms. Barnhart.  Ms. Barnhart never told

19  me that she did not work for a state agency or that Ms. Fulmer incorrectly stated that she did.

20  Ms. Barnhart then sent me another direct message on Twitter on December 25, 2020, which was

21

22

---

23  [2] *See* Signed Barnhart Decl. Dkt. 38-1, ¶ 17.  Despite Mr. Brown's attempts to have Ms. Barnhart sign a declaration
falsely attesting to contrary facts that her criminal case did not involve harm or threat of harm on any person, or that
24  it was dismissed for lack of merit [see Dkt. 43-1 Ex. B p.. 85 of 221 at ¶ 3, p. 101 of 221 at ¶ 4, and p. 120 of 221 at
¶ 5], the Affidavit of Probable Cause confirms otherwise. Plaintiffs, however, do not wish to attach said public
25  record as an exhibit in these proceedings due to the personal nature of the facts contained therein. However, if
necessary, said Affidavit will be made available for this Court's review upon request. Nevertheless, said Affidavit is
26  a public record and was equally available to Mr. Brown to review before he attempted to have Ms. Barnhart sign a
declaration falsely attesting to its contents under penalty of perjury.

**DECLARATION OF MICHAEL J.**
**SALTZ -6**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

cryptic in nature and was taken by me as a threat rather than as notice that any information in the Fulmer Declaration was inaccurate.

11.     In the December 25 message, Ms. Barnhart stated that Ms. Fulmer and I "doxed the wrong person again. You will hear about it next week." However, no further detail was ever provided by Ms. Barnhart with regard to what was meant by said message, and Ms. Barnhart never clarified that she did not work for a state agency.  I did not respond to Ms. Barnhart's messages, as she had instructed me not to. Likewise, prior to receiving said messages, I had made no effort to contact Ms. Barnhart after responding to her efforts to initiate contact with me on Twitter in early November 2020. Below are true and correct screenshots of the relevant portions (with provided screenshots by Ms. Barnhart omitted) of said direct messages from Ms. Barnhart to myself:







12.     Ms. Barnhart had a private Twitter account to which I did not have access. I cannot view any tweets she may have made to that account, including any tweets about me allegedly "doxing" the wrong person.

13.     Ms. Barnhart expressly informed Mr. Brown several times that she had <u>privated</u> her Twitter account and that <u>only people she followed</u> on Twitter could view her postings on her Twitter page.[3]

14.     Prior to January 12, 2021, Ms. Barnhart never informed me, and I did not know, that the Lori Barnhart identified by Ms. Fulmer as working at a state government agency was not the real Ms. Barnhart.

**D.  <u>MY JANUARY 4 DECLARATION</u>**

15.     After the timely filing of Plaintiffs' Opposition papers to Defendants' Motion to Dismiss, Ms. Paulson posted on social media a false narrative about her connection to Ms. Barnhart. One specific tweet purportedly published by Ms. Paulson on December 30, 2020 to the public responded to the contents of Plaintiffs' Opposition papers by stating: "I have no connection to Lori Ann." Below is a true and correct copy of a screenshot I obtained of said tweet:



16.     However, at the time of said tweet, our office was already investigating evidence that had just come to light the evening of December 29, 2020 that Ms. Barnhart's connection

---

[3] See Dkt. 43-1 Exb. B pp.. 37 of 221, ("my twitter is <u>private</u>"), and 144 of 221 ("Also my twitter had been <u>made private</u>. (Meaning <u>only the people I followed on twitter could see my tweets</u>) for at least a month. I also blocked some accounts.").

DECLARATION OF MICHAEL J.
SALTZ -8
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

with Ms. Paulson was more significant than what Ms. Fulmer attested to in her declaration. This included, but was not limited to, the fact that Ms. Barnhart had been a paid member of Ms. Paulson's YouTube channels, a fact which otherwise appears to directly negate Ms. Paulson's previous statements to this Court that she does not derive any income from Washington. What is more, on or about December 29, 2020, Ms. Barnhart deleted all of her social media accounts, thus effectively obliterating any and all public displays of Ms. Barnhart's connection to Ms. Paulson and all direct messages on Twitter that Ms. Barnhart had with Ms. Paulson. It is my personal experience that direct messages on Twitter delete and disappear from my account whenever the account with whom I have communicated deactivates their account. This means that the act of deactivating Ms. Barnhart's account not only obliterated her Twitter direct message conversation with me, but it would have obliterated her Twitter direct message conversations with Ms. Paulson from her Twitter account as well.

17.     On December 30, 2020, I participated in a meet and confer call with Mr. Brown. Ms. Elana Levine and Ms. Susan Kaplan were also in attendance. During the call, I explained to Mr. Brown that Ms. Barnhart had deleted all of her social media accounts the night before. I also explained to Mr. Brown that we are aware that Ms. Paulson has communicated directly with Ms. Barnhart on Twitter, and that if we do not get Twitter to preserve the data from Ms. Barnhart's account within thirty (30) days of the account's deletion, all of the data from Ms. Barnhart's account becomes permanently unrecoverable. As such, we expressly told Mr. Brown that, to the extent that he was requesting that the parties stipulate to stay discovery in this matter pending the Court's ruling on jurisdiction, we needed to carve out an exception to the discovery stay for Ms. Barnhart. Mr. Brown then stated that he would agree to carve out an exception to the discovery stay to allow Plaintiffs to subpoena Ms. Barnhart's social media account information. At no time during said call did Mr. Brown disclose that he had been in regular direct contact with Ms. Barnhart for approximately a week or that the person working at the state government agency was not the real Ms. Barnhart.

1

### E.  <u>COMMUNICATIONS WITH MS. G</u>

2

18.     On or about January 1, 2021, I noticed a tweet wherein a person using a Twitter

3

account belonging to someone that I will simply identify as "Ms. G" was stating that she had lost

4

contact with Ms. Barnhart and was concerned about her. I responded to Ms. G privately via a

5

direct message on Twitter. Below are true and correct copies of screenshots I obtained from my

6

Twitter account of said conversation I had with Ms. G (redacted to protect health information):

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



19.     At no time did I intend to threaten Ms. G. or Ms. Barnhart in these communications. In fact, Ms. G confirmed that her perception of the conversation was that I was trying to be "a friend," which by definition is not threatening.[4]

20.     After Ms. Barnhart's signed declaration was filed with this Court, and during a time period I had been granted access into Ms. Barnhart's Twitter account to document messages and tweets, I reviewed direct messages from Ms. G to Ms. Barnhart in which Ms. G stated that Mr. Brown attempted to get Ms. G to sign a declaration accusing me of harassment. Below are true and correct redacted copies of screenshots I obtained of said Twitter conversation:




---

[4] See Dkt. 43-1 Exb. B p. 153 ("He tries to make one think he's a friend.").

**DECLARATION OF MICHAEL J. SALTZ -11**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

1
2
3
4
5
6
7
8
9
10
11
12
13



14   **F.   MS. BARNHART CONTACTED PLAINTIFFS' COUNSEL**

15        21.      On or about January 10, 2021, at approximately 7:54 PM—just two minutes after

16   Ms. Barnhart called Mr. Brown a "slime ball" in an email to him—Ms. Barnhart sent me a series

17   of direct messages to my Twitter account from an alternate account belonging to her. In these

18   messages, she gave me her phone number and said that she "sees what is happening now" and

19   invited me to call her. She said that she had previously called Mr. Brown and said that she "got

20   sucked in and believed him too!" She said that she had no problem giving me access to her social

21   media accounts and that she did not have anything to hide. She apologized for previously being

22   rude to me and stated that she would answer any questions that we have. Below are true and

23   correct copies of screenshots I obtained from my Twitter account of said messages sent to me

24   from Ms. Barnhart:

25
26

**DECLARATION OF MICHAEL J.**
**SALTZ -12**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104



This is Lori you can call me if you like. I see what is happening now. 425

1/10/21, 7:54 PM

I have no problem giving you access to my twitter, Facebook, Instagram. I don't use Snapchat.

1/10/21, 8:20 PM

My Instagram is just a sock account I use to watch Instagram live videos but you can have it.

1/10/21, 8:21 PM



I felt I was being harassed. Since my post on May 2 I don't recall making any "threats" but you can look. The worst stuff about me is everything Real Housewife gave you.  I did say if people kept at me I have people that will stick up for me.

1/10/21, 8:24 PM



So everyone turned their focus on me and tried to entice me to say or do something.  They wanted me to lash out.  I could never figure out why everyone wanted to be my "friend" and why I had so many people wanting to follow me.
Wow I've been the idiot this whole time!  Then I contacted Katie's lawyer and I got sucked in and believed him too!

1/10/21, 8:27 PM



If it would be easier to just give you full access and not just what I shared with Katie I can do that.  I just don't know how to do it myself.  I don't have anything to hide. I am not hiding documents or  anything for Katie.  She doesn't have my phone number, I was never in her discord or a mod for her. The only discord I was in were the two that housewife was in.  I did have another discord account before but I didn't use it.  I was invited into one that was ran by a man named Heretic, but I never made comments.  I looked at it maybe two times.

1/10/21, 8:44 PM

**DECLARATION OF MICHAEL J. SALTZ -13**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104





22.     Because I do not accept direct messages on my Twitter account from unknown accounts, the above-messages from Ms. Barnhart were held in a spam filter that I did not check until the morning of January 12, 2021. Once I saw these messages, I texted Ms. Barnhart's number on January 12, 2021 at 7:38 AM to inform her that I received her messages and to inquire about a convenient time to schedule a call. Ms. Barnhart texted me back at 9:38 AM on January 12, 2021 that she could immediately talk and then proceeded to call my cellphone. Below is a true and correct screenshot of said text messages I had with Ms. Barnhart on January 12, 2021:

1

2

3

4

5

6

7

8

9

10

11



12      23.     As soon as Ms. Barnhart called me, I joined Ms. Levine to the call so that I would

13  have an additional witness to help document the conversation. Ms. Levine and I spoke with Ms.

14  Barnhart for approximately eleven (11) hours on the phone on January 12, 2021, and

15  approximately five (5) to six (6) hours on January 13, 2021. During that time, we assisted Ms.

16  Barnhart in reinstating her @Bloodtall Twitter account, which took a few hours. Although we

17  were able to reinstate that Twitter account, we were unable to recover the direct messages.

18      24.     In addition to reinstating one of Ms. Barnhart's Twitter accounts—her other

19  Twitter accounts which she also used to communicate with Ms. Paulson could not be

20  reinstated—Ms. Barnhart forwarded a number of emails between herself and Mr. Brown for our

21  review. Ms. Barnhart stated that she was uncertain as to whether she had the capability of

22  forwarding to Ms. Levine and myself all of her email communications with Mr. Brown because

23  she had been the victim of hackers after she cut off ties with Mr. Brown and that they were in her

24  email accounts deleting emails. Below is a true and correct copy of a screenshot of the message I

25  received from Ms. Barnhart wherein she stated that she believed that hackers were actively in the

26  process of deleting emails from her email account as we were speaking:

**DECLARATION OF MICHAEL J.
SALTZ -15**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

1
2
3
4
5
6
7
8
9
10
11



12    25.    Ms. Barnhart also frequently told us, both orally and in writing, that we had her

13 full permission to review her social media accounts and emails so that we could verify and

14 confirm everything she was telling us. Ms. Barnhart also confirmed that Mr. Brown never

15 reviewed or asked to review Ms. Barnhart's social media accounts and/or email accounts to

16 independently confirm *any* of the information that Mr. Brown wanted Ms. Barnhart to proclaim

17 on Defendants' behalf. Below are true and correct copies of screenshots of some of the texts I

18 received from Ms. Barnhart making said offers:

19
20
21
22
23
24
25
26




**DECLARATION OF MICHAEL J. SALTZ -16**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

26.     To be certain, Ms. Barnhart stated to me in a text message that she has a tendency to initially jump to conclusions based upon her feeling intimidated by people or stressed. As such, Ms. Barnhart apologized for this trait, said that she "should come with a disclaimer," and stated that she very much appreciated that Ms. Levine and I were taking the time to go through her documents and social media history and posts with her to refresh her recollection of facts and events that had verifiably happened. Below is a true and correct copy of a screenshot of a text message I received from Ms. Barnhart:



27.     At the beginning of our conversation with Ms. Barnhart, she explained to us that she has certain personal health issues. As such, I knew that it was important to treat Ms. Barnhart with patience and respect, and therefore Ms. Levine and I remained on the phone with Ms. Barnhart for approximately more than eleven hours on the first day carefully going over documents with her in real time to make sure she understood everything we were asking of her and so that she did not feel overwhelmed or alone in the process.

28.     During the call, Ms. Levine and I reviewed Ms. Barnhart's emails with Mr. Brown and noticed that it appeared an attorney-client relationship, or at the very least a prospective client relationship, had formed between her and Mr. Brown. Based thereon, Ms.

Levine and I halted our inquiries until Ms. Barnhart could convince us that she had terminated her relationship with Mr. Brown.

29.      Ms. Barnhart then confirmed to us that: she ended her relationship with Mr. Brown, called Mr. Brown a "slime ball," and cut off communications with Mr. Brown. Based thereon, it was our understanding that Ms. Barnhart had terminated her relationship with Mr. Brown prior to speaking with us.

30.      During our conversation with Ms. Barnhart, I asked her if she would reinstate her Twitter account so that we can assure the data therein would not be lost. Ms. Barnhart did so, which took several hours. She then gave me her login information so that I could view her Twitter account information. I personally signed into, and went through a significant portion of, the history of Ms. Barnhart's @Bloodtall Twitter account. In doing so, I reviewed hundreds of instances wherein Ms. Barnhart and Ms. Paulson interacted and communicated publicly with one another. Specifically, I personally saw that, starting in or about January 2020 to August 2020, Ms. Barnhart and Ms. Paulson interacted almost every week, and sometimes several times a day. Attached hereto as Exhibit "1" is a small sampling of screenshots of just some of the interactions between Ms. Paulson and Ms. Barnhart on Twitter that I obtained from Ms. Barnhart's Twitter account with her permission.

31.      At one time, Ms. Paulson also made a deliberate effort to inform Ms. Barnhart that Ms. Paulson followed Ms. Barnhart on Twitter.   Below are true and correct copies of screenshots that I obtained from Ms. Barnhart's Twitter account with her permission showing that connection:

**DECLARATION OF MICHAEL J. SALTZ -18**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

 

16    32.    On the same day I had interviewed Ms. Barnhart, I had been made aware of, and

17 watched, a video of another YouTube creator that goes by the name Unirock. Specifically, on

18 August 14, 2020, Unirock posted on his Periscope a livestream video called "Live scope with

19 kate without a crystal ball" on which he had Ms. Paulson on as a guest. At approximately 56

20 minutes into the video, I witnessed Ms. Paulson unilaterally start speaking about Ms. Barnhart

21 and state: "Lori is so mad at me for literally trying to end drama with um.. I'm sorry I

22 disappointed you Lori...I am… with Leslie... but I have to do this for myself. And I have to move

23 forward. And just like I can't… you know…I couldn't stay mad at Kyle forever… actually a

24 good friend of mine… I was friendly with Leslie… I don't know why anyone wants to

25 perpetuate this drama." Later on in this same video, at approximately the 78 minute mark, I

26 witnessed Ms. Paulson demonstrate such a familiarity with Ms. Barnhart that she was able to

identify that a person pretending to be Ms. Barnhart in the live chat was a "fake," and stated:

"There's two Lori Anns in here…There's someone that's fake." I have uploaded a true and correct copy of this video that to a Dropbox for the Court's convenience, which may be viewed at this link:

https://www.dropbox.com/s/ny9ol3dvg5a7xxk/2020.08.14%20Periscope%20unirocktv%20-%20Live%20scope%20with%20kate%20without%20a%20crystal%20ball.mp4?dl=0

33.     I then went back to watch the video on Defendants' WOACB YouTube channel titled "100K Celebration Stream - Join the Conversation," which was uploaded to said channel on June 9, 2020, and of which I mentioned in a previous declaration. In watching said video, I personally witnessed, at approximately 35 minutes therein, a person I know to be Ms. Paulson display on her video screen a message from Ms. Barnhart's YouTube account along with her picture. I then heard Ms. Paulson simultaneously say: "Oh, this one. Lori. Don't ever get into it with Lori. Lori remembers your names. Lori is the catalog. Lori didn't like me at one point and now she is my best friend." A true and correct copy of a screenshot I had obtained from said video displaying Ms. Barnhart's YouTube name and picture (which corresponded to the pictures used on Ms. Barnhart's Twitter @bloodtall account) is below:



34.    I had downloaded this YouTube video directly from YouTube without the live chat to a Dropbox for the Court's convenience, which is available for viewing at: https://www.dropbox.com/s/tgc1s7m65nw0njo/2020.06.09%20100K%20Celebration%20Stream%20-%20Join%20the%20Conversation.mp4?dl=0.  Said screenshot verifies that the Ms. Barnhart's YouTube account name had a paid membership loyalty badge next to it that is only available to members of Defendants' YouTube channel that pays Defendants a recurring monthly fee.



35.    On January 12, I discussed these videos with Ms. Barnhart. I told her that I was confused as to how Ms. Paulson could proclaim that she had no connection to Ms. Barnhart when she publicly spoke about her familiarity with, and intimate knowledge about, Ms. Barnhart. Ms. Barnhart then stated to me that, while they were not "best friends," as Ms. Paulson stated in her June 9, 2020 video, they were significantly closer than the average fan or paid member.

36.    Also during the January 12, 2020 interview, and along this vein of questioning, I asked Ms. Barnhart about the ways by which she would communicate with Ms. Paulson. Ms. Barnhart told me she would mainly communicate with Ms. Paulson through Facebook direct messages, Twitter direct messages, and openly on Twitter. She initially could not remember whether she had communicated with Ms. Paulson via email. I then asked Ms. Barnhart about her 1,500-word statement that she wrote for Mr. Brown explaining her story to him. I specifically brought to her attention to the portion of said statement that said: "I reached out to [Ms. Paulson] around April [2020] and I told her **my life story**." I then asked Ms. Barnhart a series of questions based on these statements. First, I asked how is it that she could tell Ms. Paulson her "life story"

DECLARATION OF MICHAEL J.
SALTZ -21
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

without telling Ms. Paulson that she lived in, or was from, Washington. Ms. Barnhart stated to me and Ms. Levine that she definitely told Ms. Paulson that she lived in Washington as part of her "life story." She also said that she was Facebook friends with Ms. Paulson, and that Ms. Barnhart's Facebook page expressly stated—immediately next to her name—that she lives in Washington. Ms. Barnhart also said that she informed Mr. Brown that she was friends with Ms. Paulson on Facebook, which we confirmed in one of her emails with Mr. Brown. I then asked Ms. Barnhart by what method did she communicate her "life story" to Ms. Paulson. Ms. Barnhart stated that she had sent Ms. Paulson her "life story" in an email, and that Ms. Paulson replied to said email. I then pointed out to Ms. Barnhart that she just admitted to communicating with Ms. Paulson via email, to which Ms. Barnhart responded: "Yes. I guess we did." Ms. Barnhart then clarified that she rarely communicated with Ms. Paulson via email but admitted that it had happened.

37.    Given the existence of an apparent significant connection between Ms. Barnhart and Ms. Paulson that we had documented through Twitter and said videos, I asked Ms. Barnhart about Ms. Paulson purportedly assigning tasks for her to perform on Ms. Paulson's behalf. I specifically brought to Ms. Barnhart's attention the following screenshots that I had obtained from Twitter:

a.    I discussed the below screenshot of Ms. Paulson telling Ms. Barnhart that she knows her "ride or dies will always shut [Ms. Paulson's detractors] down."



DECLARATION OF MICHAEL J.
SALTZ -22
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

b.    I discussed the below screenshot of Ms. Paulson telling a fan that she considers Ms. Barnhart "my fiercest and loyalist."



c.    I also discussed the below screenshot of Ms. Paulson telling Ms. Barnhart's friend that she is not worried about her detractors because "you and Lori will be on the hunt."



1

2     38.    Along with this line of questioning, I asked Ms. Barnhart whether Ms. Paulson

3 had ever asked her to perform any tasks on Defendants' behalf. Ms. Barnhart initially said she

4 could not recall such an event. I then pointed out a screenshot that I had obtained from Twitter of

5 an interaction where Ms. Paulson had asked Ms. Barnhart to deliver a message on Ms. Paulson's

6 behalf that said: "Let her know this is why she's blocked. Because I know she's trolling." Below

7 is a true and correct copy of said screenshot:



19     39.    After reviewing these messages, Ms. Barnhart recalled that Ms. Paulson had, in

20 fact, asked her to perform certain tasks on Defendants' behalf.

21     40.    I then asked Ms. Barnhart if Ms. Paulson had ever asked her to "flag," "mass

22 flag," or report any videos made by, or the YouTube channels of, Ms. Paulson's detractors.[5] Ms.

23 Barnhart was initially reluctant to answer this question out of fear of implicating herself and

24 being added to the lawsuit. In response, I assured her that we have no intent of adding her as a

25

26 ─────────────────────
[5] Flagging content means reporting violations of Terms of Service or inappropriate content to YouTube. See:
https://support.google.com/youtube/answer/2802027?hl=en&ref_topic=9387085

**DECLARATION OF MICHAEL J. SALTZ -24**
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

party to the lawsuit. Once reassured, Ms. Barnhart told us that Ms. Paulson had asked all of her viewers to "mass flag" the content of other YouTubers. Specifically, Ms. Barnhart told us that Ms. Paulson would ask her and others to help mass flag competitors' YouTube channels that made negative comments about Defendants in order to have their platforms demonetized or taken away. Ms. Barnhart stated that she recalled one such account wherein she was told to flag a video from Lil Red, a YouTube creator and competitor of Defendants, who was publishing negative content regarding Ms. Paulson.

41.     As a point of confirmation, I subsequently viewed a video on YouTube dated November 8, 2020 titled "Why You SHOULDN'T Break TOS."[6] This video is a documented collection of multiple instances wherein Defendants have publicly asked/solicited viewers and followers to mass report (i.e., mass flag) other YouTube creators amongst other people and companies, including the instance identified above by Ms. Barnhart. Specifically, at approximately the 0:33 time mark in said video, I heard Ms. Paulson state: "Please report her video. She cannot do this. This is like against terms of service." I then heard Ms. Paulson say again at the 1:29 time mark: "Please report her video… Alright. Well, I'll do it from my computer." The video then shows Ms. Paulson purportedly flagging Lil Red's YouTube channel and/or content. I have downloaded a true and correct copy of said video from YouTube and placed it into a Dropbox, which may be viewed at the following link, for the Court's convenience:

https://www.dropbox.com/s/m0cz7z6mvmefcyi/Why%20You%20SHOULDN%E2%80%99T%20Break%20TOS%20-%20Deep%20in%20a%20Thot%2011.09.2020.mp4?dl=0

42.     In that November 8, 2020 video, I saw that, in the video's live chat, a person using the YouTube moniker Canis Dirus, which I understand is an account belonging to Ms. Paulson's husband, wrote: "Thanks to everyone who has reported so far." Thereunder, I saw that other participants of said video's live chat responded with comments such as: "How do we report

---

[6] TOS means Terms of Service.

1   it??," "I just reported her. Not sure I did it right," and "reported it." Below is a true and correct

2   screenshot I obtained from said video purportedly memorializing said live chat comments in

3   response to Ms. Paulson's public request to mass report another YouTube creator's content

4   and/or channel:



18        43.    I then saw that the video went on to show more of the purported live chat from

19   said video, including the following statements: "I thought it was against the rules to ask people to

20   mass report? What am I missing here? What is this stream about tonight? Mass reporting?". I

21   also saw that, in said live chat, other participants stating that the YouTube creator that is the

22   subject of the purported public mass flagging request is Lil Red. Below is a true and correct

23   screenshot I obtained from said video's memorialization of said comments purportedly made in

24   the referenced live chat:

25

26

**DECLARATION OF MICHAEL J.
SALTZ -26**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

44.     This information therefore provided me the basis for developing the good faith belief that Ms. Barnhart was being completely truthful about her being publicly asked by Ms. Paulson to mass flag Lil Red's content and/or channel.

45.     I asked Ms. Barnhart if Ms. Paulson had ever asked her privately to flag or report a YouTube creator's content and/or channel. Ms. Barnhart responded in the affirmative. Ms. Barnhart then described an event where Ms. Paulson instructed her in a direct message conversation to also flag a YouTube creator and competitor's YouTube channel named Sharrell's World. Ms. Barnhart stated that it occurred when she brought a video on the Sharrell's World YouTube channel to Ms. Paulson's attention. Ms. Paulson then told Ms. Barnhart to report it and instructed her how to do so. Ms. Barnhart then stated that she followed Ms. Paulson's directions as requested and reported said channel to YouTube for having inappropriate content.

46.     Although Ms. Barnhart was unable to produce the direct message conversation in which she claimed to have been instructed by Ms. Paulson to mass report a YouTube channel, the story Ms. Barnhart told us was corroborated by information that we had been provided of other instances of Ms. Paulson reaching out to others privately to solicit the mass reporting of YouTube channels and content. Specifically, by way of example, and not limitation, I had been provided purported screenshots of a private direct message conversation Ms. Paulson had with

another individual wherein Ms. Paulson seemingly asked said person: "Do you have trolls that can mass report"? I have been provided no information to make me believe that said screenshots have been fabricated or are not an accurate recordation of that portion of said direct message conversation. As such, I had developed the good faith belief that Ms. Barnhart was being truthful in her depiction of the private instructions Ms. Barnhart received to mass flag another YouTube channel that was publishing content unfavorable to Ms. Paulson. Below are true and correct screenshots I obtained of said purported private direct message conversation that helped formulate my good faith belief in the veracity of Ms. Barnhart's statements:




47.    At a certain point in our questioning of Ms. Barnhart on January 12, 2021, she had informed us that she takes medication for her personal health issues. She later informed us that she had just taken said medicine and that the side effects will eventually make her thoughts "foggy." Based upon this information, Ms. Levine and I terminated the interview for the day and asked to pick it up again the next day after Ms. Barnhart was rested and would not be suffering any effects from her medication. As such, Ms. Levine and I continued our interview with Ms.

Barnhart the next day on January 13, 2021. Ms. Barnhart also sent me a text message on January 13, 2021 making sure that she used the term "mass flagging" correctly in her rendition of the events described above regarding her reporting of the Sharrell's World YouTube channel, and asked for reassurance that she had not added herself to the lawsuit by disclosing such information. I assured Ms. Barnhart that we had no intent on adding her to the lawsuit. Below is a true and correct copy of a screenshot I took of said text messages from January 13, 2021:



48.    On January 13, 2021, Ms. Levine and I spent another five (5) to six (6) hours communicating with Ms. Barnhart. Ms. Barnhart described the circumstances and events that

**DECLARATION OF MICHAEL J. SALTZ -29**
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

1  ultimately lead to Ms. Barnhart tweeting about her toxic relationship with Ms. Paulson and that
2  she was better off after having created distance between them. Attached hereto as Exhibit "2" are
3  true and correct copies of various screenshots of Ms. Barnhart's tweets talking about her



16  separation from Ms. Paulson. Of particular note, Ms. Barnhart identified one particular tweet
17  from Ms. Paulson after Ms. Barnhart had informed her that she would be "moving on," to which
18  Ms. Paulson wrote to Ms. Barnhart: "Lori, I adore you. You know that. That doesn't change."
19  We then asked if Ms. Barnhart could explain why Ms. Paulson would say such things to Ms.
20  Barnhart if there was no connection between the two of them. Ms. Barnhart responded that Ms.
21  Paulson simply was not telling the truth about their connection or interactions. Below is a
22  screenshot I had obtained from Ms. Barnhart's Twitter account of said interaction with her
23  permission:

24      49.    Based on Ms. Barnhart's answers and supporting documentation throughout the
25  interview, I believed that sections of the proposed declarations that Mr. Brown wanted Ms.

DECLARATION OF MICHAEL J.
SALTZ -30
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

Barnhart to sign under penalty of perjury contained false information. These include, but are not limited to, the following statements:

   a.   "My interactions with Ms. Paulson have been limited to: (1) a few brief online conversations unrelated to this matter; (2) the fact that I was a subscriber to her channel for a brief time in __ [sic], 2020; and (3) the fact that last week I sent her a few 'chats' (after the filing of the Fulmer Declaration)."[7] I believed this statement to be false as demonstrated by the above stated evidence of the significant amount of interaction between Ms. Paulson and Ms. Barnhart on Twitter and elsewhere;

   b.   "Ms. Paulson and I have never been friends and have had very little direct contact."[8] I believed this statement to be false as demonstrated by Ms. Paulson's statements made in the aforementioned August 14, 2020 Unirock video, the statements in the June 9, 2020 video, the Tweets from Ms. Paulson about Ms. Barnhart when Ms. Barnhart was not a party to the conversation, and the Tweets from Ms. Paulson indicating that she "follows" and "adores" Ms. Barnhart; and

   c.   "I have no reason to believe Ms. Paulson knew what state I lived in until very recently."[9] I believed this statement to be false in that Ms. Barnhart expressly told Mr. Brown that she had told Ms. Paulson her "life story" back in April 2020.[10]

50.   Ultimately, Ms. Levine sent Ms. Barnhart a draft of her declaration for review. We went over the declaration with Ms. Barnhart in a phone conversation wherein I read every single sentence to Ms. Barnhart, stopped at the end of each paragraph, and made sure that Ms. Barnhart understood what was being said and to check in with Ms. Barnhart as to whether she had edits. At the conclusion of reviewing said declaration, we sent Ms. Barnhart the corrected

---

[7] Dkt. 43-1, Ex. B, pp. 102, 121 of 221.
[8] Dkt. 43-1, Exh. B pg 102 of 221 (see also pg. 121 of 221).
[9] Dkt. 43-1, Exh. B pg 102-103, 122 of 221.
[10] See Dkt. 43-1, pp. 56-60. One generally does not tell the intimate details of one's life story without sharing basic details such as where the person is from or where they currently live.

DECLARATION OF MICHAEL J.
SALTZ -31
(2:20-CV-01606-BJR)

CARROLL, BIDDLE, & BILANKO, PLLC
1000 2nd Avenue, Suite 3100
Seattle, WA 98104

1  and final version of the declaration with her edits included. Ms. Barnhart then downloaded the

2  declaration on her phone—without difficulty—and returned the declaration signed.

3  ## G.  THE JANUARY 27, 2021 TELEPHONIC CONFERENCE OF COUNSEL

4     51.    Mr. Brown misstates the meet and confer process. First, on January 27, 2021, we

5  engaged in a telephonic conference call that lasted a total of 40 minutes—not one hour as stated

6  in Mr. Brown's time records. After approximately 40 minutes on the call, Mr. Brown indicated

7  that he had to relieve his associate, so he could not complete the meet and confer process. The

8  conference call was supposed to be regarding the following four anticipated motions to be

9  brought by Mr. Brown:

10     a)  Motion for sanctions under § 1927 (the instant motion);

11     b)  Motion for Rule 11 sanctions;

12     c)  Motion to shorten time on the 21-day safe harbor period for the Rule 11 motion; and

13     d)  Motion to Qualify Mr. Brown to continue to represent Defendants.

14     52.    In regard to the instant motion and the motion for Rule 11 sanctions, I indicated

15  during the January 27, 2021 conference call that the legal standard attendant to these motions is

16  that no reasonable attorney would have filed Ms. Barnhart's declaration. I also indicated that I

17  was more than willing to share with him the documents that our office reviewed in drafting Ms.

18  Barnhart's declaration. Mr. Brown did not follow up with my offer before filing his Motion for

19  Sanctions. However, during the call, Mr. Brown did question various aspects of Ms. Barnhart's

20  declaration.

21     53.    Mr. Brown's declaration indicates that "they" told Mr. Brown [during the call]

22  that Ms. Barnhart is easily "confused," has a poor memory, and suffers from "foggy" thinking,

23  especially when she is under "unusual stress and anxiety, and is taking a certain medication, as

24  she had been during the prior several weeks (since the Fulmer Declaration was filed). This, they

25  insisted, explained why she told [Mr. Brown] a fake story over a period of 18 days and 150

26  exchanged emails." Mr. Brown's entire recantation of said discussions during the telephone call

**DECLARATION OF MICHAEL J.**
**SALTZ -32**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

is false. What I said during the call was that Ms. Barnhart suffers from personal health issues for which she takes medication. I said that the side effect of said medication, when it kicks in, makes her "foggy." I explained to Mr. Brown that, Ms. Barnhart had advised us at a certain point in our interview process that her medication was kicking in. I then said that this caused us to adjourn our call on January 12, 2021, and pick back up the next day when Ms. Barnhart would be thinking more clearly. No one told Mr. Brown that Ms. Barnhart had told him a false story. I also said that Ms. Barnhart was confused by Mr. Brown, and that she felt he was manipulating her to say things that were not true. Additionally, contrary to his statement in paragraph 5 of his declaration, no one told Mr. Brown that *we* rushed to complete the interview with Ms. Barnhart and obtain her signature. Rather, I told Mr. Brown that Ms. Barnhart was upset with him because her primary concern was to correct the apparent error in Ms. Fulmer's declaration as soon as possible, and that after nearly three weeks, Mr. Brown had taken no steps to inform Plaintiffs' counsel of said error so that it could be immediately corrected.

54.   During the January 27, 2021 call, Mr. Brown asked about the "mass flagging" referenced in Ms. Barnhart's declaration, at paragraph 9. Ms. Levine informed Mr. Brown that there have been videos made about Defendants instructing others to flag other YouTube channels, in violation of terms of service, referenced above. Subsequent to the call, Ms. Levine sent Mr. Brown a link to one of these videos, which corroborated Ms. Barnhart's testimony on the matter, and Mr. Brown thanked her. However, Mr. Brown pressed forward with his Motion for Sanctions, ignoring the evidence that we provided to him during the call, insisting that the entire declaration of Ms. Barnhart is still false, and refusing to meet and confer with us to go over the documents that Plaintiffs had obtained from Ms. Barnhart in advance of the filing of his motion that confirm her truthful and corroborated statements contained therein.

55.   We also did not complete the meet and confer process as to the other potential motions that Mr. Brown indicated that he was intent on bringing. At the conclusion of the

DECLARATION OF MICHAEL J.
SALTZ -33
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

January 27, 2021 call, Mr. Brown, though needing to cut the call short, did not attempt to reschedule before filing the instant motion.

**H.  EMILY D. BAKER**

56.    Mr. Brown incorrectly speculates that I have some sort of pre-existing relationship with YouTube legal commentator and creator Emily D. Baker, and/or that we are in some manner influencing Ms. Baker to produce content unfavorable to Ms. Paulson. I have had no pre-existing relationship with Ms. Baker. Although we both have worked in the Los Angeles County District Attorney's Office, I stopped working there in the late 90s, and it is my understanding Ms. Baker started working there in the mid 2000s. I have never asked Ms. Baker to cover any aspect of this case or to say anything about Ms. Paulson. Rather, it is my understanding that Ms. Baker obtains copies of the court documents in this matter and explains them to her audience in a manner that non-legal professionals can understand. The fact that Ms. Paulson and/or Mr. Brown perceive that the coverage of this case by Ms. Baker is unfavorable has only to do with the nature and content of the filings in this case, and not because of any alleged "alliance."


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


SIGNED on March 3, 2021


/s/ Michael J. Saltz
Michael J. Saltz, Esq.

**DECLARATION OF MICHAEL J. SALTZ -34**
(2:20-CV-01606-BJR)

**CARROLL, BIDDLE, & BILANKO, PLLC**
1000 2nd Avenue, Suite 3100
Seattle, WA  98104

# EXHIBIT "1"



**Katie Joy** @woacboff... · 3/20/20 ···
It's probably Kim and one of her fake accounts
💬 1    ⟲    ♡ 6    ⬆️

**Lori Ann** 💫 🔒 @Bloo... · 3/20/20 ···
Sorry, I'm being pretty quiet but some of these personal  attacks on your mothering make me mad.
💬 1    ⟲    ♡ 8    ⬆️    ◫

**Lori Ann** 💫 🔒 @Bloo... · 3/20/20 ···
Replying to @MMAGamblingtips @JumetPrincess and 2 others
The only reason he got involved with Lillee and Leslie was because of Katie.  It all has to do with Katie.
💬 1    ⟲    ♡ 7    ⬆️    ◫



**Lori Ann** 💫 🔒 @Bloo... · 3/24/20 ···
I think of it came down to it the courts would have allowed him to stay in the home otherwise she would have made him move out. That's why she is now saying he "made" her lose her home.
💬 1    ⟲    ♡ 2    ⬆️    ◫

**Katie Joy** @woacboff... · 3/24/20 ···
There was a restraining order at the time. She had to leave. There was no choice. It's Andrew's legal address and they have an active restraining order. She can't go there and the court will not make the victims leave
💬 1    ⟲    ♡ 5    ⬆️













**Katie Joy** @woacboffi... ·4/14/20 ···
The Funniest Reality TV Recap YouTube Channels To Give You a Laugh During the Coronavirus Outbreak - I made the cut 🤣 😂

The Funniest Reality TV Recap YouTube Channels To Give You...
cheatsheet.com

♡ 3    ♡ 15

**Lori Ann** 💫 🔒 @Bloo... ·4/14/20 ···
Go Katie!



**Katie Joy** @woacboffi... ·4/15/20 ···
Ok so Maci says that Ryan looked High at the Zoo. I didn't think he looked high at the zoo. I thought he looked like he had a cold or something. But I don't know. What do you think? I feel like when he's been high on the show he's never been that engaged.

♡ 28    ♡ 20

**Lori Ann** 💫 🔒 @Bloo... ·4/15/20 ···
I definitely think he was high.  He doesn't look well.

♡ 3







 **Katie Joy** @woacboffi... ·8/13/20 ···

I can't see Cathey's response. What Jo is doing now isn't ok with me

💬 1      ⟲      ♡      ⬆️

 **Lori Ann**   @Bloo... ·8/13/20 ···

I haven't seen any proof of jo doing anything since she apologized.  I've seen a lot of threats made directly to her in chats though.  But moving on it's not my issue to be concerned with.

💬 3      ⟲      ♡ 7      ⬆️      �ⅼⅼⅼ

 **Katie Joy** @woacboffi... ·8/13/20 ···

Lori, I adore you. You know that. That doesn't change

💬 2      ⟲      ♡      ⬆️

# EXHIBIT "2"



 **Lori Ann** 💫 🔒 @Bloo... · 9/22/20   ···

Anyone who gets involved with the kj situation is at risk for being doxed and harassed.  Even making one comment.  No matter what side you are on.  If you are already having issues with mental health or can't handle being found out stay on the sidelines.

💬        ⇄        ♡ 3        ⬆        ᶦᴵᶦ

 **Lori Ann** 💫 🔒        ···
@Bloodtall

Replying to @UNIBLAB7 and @shenspantyliner

No story is worth it.  Katie is bad but she isn't a serial killer.  IMO

11:03 PM · 9/16/20 · Twitter for iPhone



**Lori Ann** 🪐🔒
@Bloodtall

Not everyone is strong enough to share their story.  It can effect their well being.  I feel like all this attention given to her is actually helping her to grow.  Just my opinion.  My life is so much better since I walked away from her on my own violation.

2:01 AM · 9/22/20 · Twitter for iPhone



**Lori Ann** 🪐🔒
@Bloodtall

Replying to @Menace2Sobriet2 @MotherFunk3 and @ebjjcomicnut

Uni would be better off without Katie. He's  lost a subs over her and she treats him bad.  I no longer support them.  Katie cares about Katie.  I'm just one sub so my thoughts don't really matter.  I just observe and try to keep my opinions to myself now.

11:35 PM · 9/5/20 · Twitter for iPhone



**Lori Ann** 🪐🔒
@Bloodtall

Replying to @Menace2Sobriet2
@MotherFunk3 and @ebjjcomicnut

I can see the legit criticisms and I personally can no longer support her.  I voice my opinion here and there but there is so much negativity in this world it can be exhausting.   She will do herself in before too long.

11:16 PM · 9/5/20 · Twitter for iPhone



**Lori Ann** 🪐🔒
@Bloodtall

Replying to @mandydolan76

I cannot say much because I myself have said a lot of mean things, which I take full responsibility for, but that doesn't make it excusable.  I see it all now. I don't know why they did that last night it certainly isn't going to help the situation.

11:11 AM · 8/22/20 · Twitter for iPhone